In re Robert H. HERRING, Debtor.

Benny Joe MONTGOMERY, Plaintiff,

v.

Robert H. HERRING, Defendant.

Bankruptcy No. 94–00545–BGC–7.
Adv. P. No. 94–00062.

United States Bankruptcy Court,
N.D. Alabama,
Southern Division.

June 30, 1995.

---

Richard Jones, Birmingham, Alabama, for Defendant–Debtor.

Dennis Jacobs, Birmingham, Alabama, for Plaintiff.

## MEMORANDUM OPINION

BENJAMIN COHEN, Bankruptcy Judge.

This matter came before the Court for trial on the Complaint to Determine Dischargeability filed by Benny Joe Montgomery. Appearing were Mr. Dennis W. Jacobs, the attorney for the plaintiff; Mr. Richard L. Jones, the attorney for the defendant; Mr. Robert Herring and Mr. Benny Montgomery. The matter was submitted on the testimony offered, the exhibits admitted into evidence,

the record in the case and the arguments of counsel.

## I. FINDINGS OF FACT

On October 28, 1988, the debtor, Mr. Robert Herring deliberately shot the complainant, Mr. Benny Montgomery, with a pistol. Mr. Montgomery contends that the shooting was willful and malicious, that the debt owed to him by Mr. Herring is a result of the shooting and that the debt is consequently nondischargeable in bankruptcy. Mr. Herring contends that he shot Mr. Montgomery in self defense.

The shooting occurred in a house occupied by Ms. Kim Jones and her minor daughter, and by Ms. Peggy Jones, who is Kim Jones's mother. The only one of the three occupants in the home at the time of the shooting was Ms. Kim Jones ("Ms. Jones"). The house was owned by Ms. Peggy Jones ("Ms. P. Jones").

Ms. Jones was married to Mr. Herring for about three years, but was divorced from him several months before the shooting. Following her divorce, Ms. Jones began seeing Mr. Montgomery on a social basis. Mr. Herring and Mr. Montgomery were acquainted with one another and had, in fact, been good friends, until Mr. Montgomery began dating Ms. Jones.

In connection with the shooting of Mr. Montgomery, Mr. Herring was indicted for burglary in the first degree and assault in the first degree. After a jury was struck and the prosecution began the presentation of its case on June 20, 1989, Mr. Herring pled guilty to the assault charge. Upon his plea of guilty, Mr. Herring was convicted of assault in the first degree. The burglary charge was dismissed. Mr. Herring received a sentence of ten years and was ordered to pay restitution to Mr. Montgomery for his medical expenses. Mr. Herring made successful application for probation and was not required to spend any time in the penitentiary. Mr. Herring testified that he paid all restitution as ordered by the state court.

Within approximately three months following the shooting, Ms. Jones and Mr. Herring began living together again. Soon after the two resumed cohabitation, Ms. Jones became pregnant and remained so during Mr. Herring's criminal trial.

### A. Mr. Montgomery's Testimony

According to Mr. Montgomery's testimony, Mr. Herring had threatened Mr. Montgomery's life on several occasions since Mr. Montgomery had begun dating Ms. Jones, saying things to Mr. Montgomery like "You're a walking dead man." Mr. Montgomery talked with Ms. Jones on the telephone the morning of the shooting and Ms. Jones told Mr. Montgomery that Mr. Herring had come to her house, beaten on her door and left. Mr. Montgomery told Ms. Jones that he was coming to take her to work and then left his residence for that purpose. Approximately one-half of the way from his residence to Ms. Jones's house, Mr. Montgomery passed Mr. Herring driving in the opposite direction. Mr. Montgomery continued to Ms. Jones's house and upon arriving there parked in the driveway, which is at one end of the house, and then entered the house through the front door. Ms. Jones met Mr. Montgomery at the front door. She then proceeded to her bedroom to get ready for work while Mr. Montgomery went into another bedroom to watch television and wait for her. After about ten minutes, Mr. Montgomery heard Ms. Jones "holler Robbie is here," referring to Mr. Herring. Mr. Montgomery went into Ms. Jones's bedroom and then began walking up the hallway which leads between the bedrooms in the direction of the living room and kitchen. Mr. Montgomery knew that Mr. Herring was in the habit of carrying a pistol. Mr. Montgomery was, at that moment, unarmed.

When Mr. Montgomery arrived at the doorway between the living room and kitchen, he met Mr. Herring. The back door which leads into the kitchen from the yard was open. Mr. Herring was in the doorway between the living room and kitchen with a pistol in his right hand. The pistol was pointed straight up. Mr. Montgomery, with his left hand, grabbed Mr. Herring's hand that held the gun "trying to hold it off of me", and, with his right hand, Mr. Montgomery grabbed a metal swing set brace from the utility room in the kitchen for the pur-

pose of defending himself. Mr. Montgomery could not recall if anything was said at that time.

Mr. Herring loosed his right hand from Mr. Montgomery's grasp and hit Mr. Montgomery on the top of the head with the gun. Mr. Montgomery dropped the swing set brace but continued to scuffle with Mr. Herring. At some point during the melee, Mr. Montgomery picked up a bar stool from the kitchen, also to defend himself. Mr. Montgomery does not recall when he picked up the bar stool, or whether or not he ever actually hit Mr. Herring with either the swing set brace or the bar stool. He believes that he picked up the bar stool after he had been shot the first time. Ultimately, Mr. Herring broke free and shot Mr. Montgomery with the pistol. Mr. Herring fired the pistol several times from a distance of only a few feet. Mr. Montgomery was struck once in the stomach and once in the chest. Mr. Montgomery, after he had been shot the second time, noticed that he was covered in blood, ran back down the hall into the bathroom, where he obtained some towels to staunch the flow of blood and called for help on the bathroom telephone. When Mr. Montgomery came out of the bathroom, no one else was in the house. An ambulance carried Mr. Montgomery to the hospital where surgeons removed his ruptured spleen and repaired a bullet hole in his stomach.

### B. Mr. Herring's Testimony

As might be expected, Mr. Herring's testimony presented a different version of the events surrounding the shooting. Mr. Herring testified that during the two month period preceding the shooting, he was seeing Ms. Jones once a week and maintaining a "physical relationship" with her on those occasions. Mr. Herring was not aware that Ms. Jones was dating Mr. Montgomery, but knew that Ms. Jones and Mr. Montgomery were "friends." He had no conversations with Mr. Montgomery during that period of time, either in person or by telephone, and did not threaten Mr. Montgomery's life.

According to his testimony, Mr. Herring went to Ms. Jones's house around 6:30 a.m. on the day of the shooting. He stayed there with Ms. Jones for about three hours. During that time, Ms. Jones received several phone calls including one from her brother and others from people who were not identified to him. Mr. Herring left Ms. Jones's house somewhere around 9:00–9:30 a.m. After driving for some distance in the direction of his house twenty miles away, Mr. Herring realized that he had left his house keys in Ms. Jones's house. His house keys were on a ring separate from the keys to the car he was driving, which was his brother's car. Mr. Herring returned to Ms. Jones's house. He did not see Mr. Montgomery or know that Mr. Montgomery would be at Ms. Jones's house. After about ten or fifteen minutes he arrived at Ms. Jones's house. As he drove up the road along the side of the house, which offers a view of the rear of the house, he saw Ms. Jones through the sliding glass back door. Mr. Herring saw Mr. Montgomery's truck parked on the side of the driveway. He went straight to the back door, the purpose of which was to try to get Ms. Jones's attention so that she could retrieve and return his keys without the necessity of entering the house. Ms. Jones was no longer in the kitchen but the back door was open by a couple of inches. Mr. Herring entered the kitchen and called "Hey Kim." He then proceeded through the kitchen into the living room. There he saw Mr. Montgomery advancing toward him in the hallway to his left. When Mr. Herring turned toward Mr. Montgomery, Mr. Montgomery struck him with the swing set brace. Mr. Montgomery did not say anything before he struck Mr. Herring. Mr. Herring blocked the blow with his left arm to prevent the brace from hitting him in the head. Mr. Montgomery swung the brace again and hit Mr. Herring in the chest. Mr. Montgomery struck Mr. Herring three or four times with the brace. Several photographs were introduced into evidence showing a large bruise under the bottom of Mr. Herring's left arm above the elbow.

As the fight began, Ms. Jones was standing behind Mr. Montgomery in the hallway, and screamed, "Yall quit or I'm calling the police." Mr. Herring told Ms. Jones to "Call," and did not see Ms. Jones again until the struggle was over.

Mr. Herring had a pistol in his back pocket. The pistol was loaded and there was a round in the chamber. The safety was on. While Mr. Montgomery was hitting him with the brace, Mr. Herring reached into his back right pocket, retrieved his pistol, and hit Mr. Montgomery in the head with it. Mr. Montgomery dropped the brace and knocked Mr. Herring back into the wall next to the kitchen door. Mr. Montgomery grabbed Mr. Herring's arm and slung him across a table into the wall between the hallway and the front door. Mr. Montgomery ran into the kitchen and came back into the living room with a bar stool. Holding the stool by the padded end, Mr. Montgomery raised it above his head and brought it down to strike Mr. Herring on the head and left shoulder. Mr. Herring grabbed the rungs of the bar stool with his left hand only and jerked it away from Mr. Montgomery. Mr. Montgomery began to hit Mr. Herring with his fists. Mr. Montgomery pinned Mr. Herring against the living room wall close to the front door. Mr. Montgomery had his right hand on the pistol and had pinned Mr. Herring from behind. Mr. Herring was facing the wall with the pistol pointed at his forehead with Mr. Montgomery apparently trying to squeeze the trigger. Mr. Herring bit Mr. Montgomery on the right hand causing Mr. Montgomery to let go of the gun. Mr. Herring then turned around, and while Mr. Montgomery was still striking Mr. Herring with his fists, fired the pistol four or five times in quick succession, aiming toward Mr. Montgomery's stomach area. Not all of the bullets hit Mr. Montgomery but some did. When Mr. Montgomery realized that he had been shot, he turned away from Mr. Herring, whereupon Mr. Herring stopped shooting, even though bullets remained in the pistol's clip. Mr. Montgomery ran down the hallway.

Ms. Jones then came into the living room. Mr. Montgomery said "I'm shot call me an ambulance." Ms. Jones and Mr. Herring went out the front door, got into his car and drove to a store. Mr. Herring asked the people in the store to call an ambulance. He did not risk using the telephone at Ms. Jones's house because he was concerned that Mr. Montgomery might resume the attack or have a gun somewhere in the house. Mr.

Herring had seen Mr. Montgomery with several pistols on different occasions previous to the incident. Mr. Herring never retrieved his house keys and does not remember where he left them.

### C. Ms. Jones's "Testimony"

Ms. Kim Jones was not called to testify. By stipulation the parties introduced three statements made by Ms. Jones. The first statement was given to the police a little more than an hour following the incident. The second statement was made by Ms. Jones on June 16, 1989, as a witness in Mr. Herring's criminal trial. The third statement was made by Ms. Jones on February 6, 1991, in a deposition taken in a civil action brought by Mr. Montgomery against Mr. Herring, which has been stayed by the pendency of this bankruptcy proceeding.

Ms. Jones's second and third statements are glaringly different from the first and the Court concludes that these statements were colored by Ms. Jones's personal allegiance to Mr. Herring with whom she was living on the dates that each of the latter two statements were given, and were influenced by the fact that she was either pregnant with or had given birth to a child fathered by Mr. Herring at the times the two later statements were given.

### 1. Ms. Jones's Statement to the Police

According to the statement Ms. Jones gave to the police, she had been divorced from Mr. Herring for about four months and Mr. Montgomery had been her boyfriend for about two and a half months. She stated that Mr. Montgomery arrived at her house on the morning of the shooting at around ten or fifteen minutes after 9:00 a.m. Mr. Montgomery's purpose for coming to her house was to take her to work. Five to ten minutes later, Mr. Herring arrived. Ms. Jones ran to lock the front door. Mr. Herring came in the back door. Ms. Jones thought that the back door was also locked and told Mr. Montgomery to come back to the back because she was not going to answer the door. The back door was usually locked but was not on this occasion.

Mr. Montgomery, who was unarmed, walked up the hall when he heard Mr. Her-

ring come in, went into the kitchen and picked up a "pot." Ms. Jones saw Mr. Herring with a gun in his hand when he came in the door. Mr. Herring started pushing Mr. Montgomery so Mr. Montgomery pushed him back. Mr. Montgomery appeared to be trying to knock the gun out of Mr. Herring's hand. Ms. Jones was in the hallway and could not see the fight very well. Ms. Jones told Mr. Herring "not to, he could leave" and heard four or five shots.

After the shooting, Mr. Herring told Ms. Jones to go with him. She went with him because she was afraid that he was going to shoot her. She persuaded Mr. Herring to stop at a convenience store. Once inside, Ms. Jones refused to leave. She called an ambulance for Mr. Montgomery. Then Mr. Herring said, "Come on, let's go" and she said, "No." When Ms. Jones saw the ambulance, she went outside and flagged it down. She rode in the back of the ambulance to the house and then went to the hospital. Mr. Herring followed the ambulance back to the house and then told the ambulance personnel something. She does not know where Mr. Herring went after that. He told her that he was going to the hospital.

Prior to the day on which the shooting took place, Mr. Herring told Ms. Jones that he was going to kill Mr. Montgomery. Mr. Herring came to her house about three weeks before while Mr. Montgomery was there and, when they would not answer the door, he slashed a tire on Mr. Montgomery's automobile. Ms. Jones's mother had forbidden Mr. Herring from being on the property. Ms. Jones knew that Mr. Herring always carried a pistol and the one he was armed with on the day of the fight was a 380 automatic. Ms. Jones testified that Mr. Herring had owned it while they were married and she had seen it numerous times.

### 2. Ms. Jones's Testimony at the Criminal Trial

Ms. Jones was called as a witness for the prosecution at Mr. Herring's criminal trial. She was at the time pregnant with a child fathered by Mr. Herring. She planned to marry him. Ms. Jones stated that she had been divorced from Mr. Herring for about two months when the shooting took place,

that he came to her house around 7:00 a.m. on the morning of the shooting at her invitation, and that he left no later than 9:15 a.m. She did not call Mr. Montgomery on the telephone that morning. Mr. Montgomery came to her house about ten minutes after Mr. Herring left. Mr. Montgomery told her that he had come to see if she needed a ride to work. After Mr. Montgomery arrived, Mr. Herring returned. And that she was in the bathroom when Mr. Herring pulled up in the driveway. Ms. Jones did not see Mr. Herring come into the house because she was in the bathroom when he drove into the driveway. She did not see him until he was in the living room.

Mr. Montgomery told her that Mr. Herring was there. She did not lock the front door. As Mr. Montgomery walked out of the bedroom into the hall, he took a pipe out of the closet in the hall. Mr. Montgomery and Mr. Herring met in the doorway between the kitchen and the living room and began to fight. Mr. Montgomery hit Mr. Herring in the arm with the pipe. When Ms. Jones first saw the gun, she was halfway down the hallway. Mr. Montgomery and Mr. Herring were in the living room fighting. Mr. Herring hit Mr. Montgomery on the head with the gun.

Mr. Montgomery went into the kitchen and picked up a bar stool, and "slung" it at Mr. Herring. Mr. Montgomery and Mr. Herring continued fighting and moved over by the front door. She told them to stop or she was going to call the police. Ms. Jones left the room and went to the back bedroom where she thought she could find a phone. There were no phones in the house other than the phone in the bedroom. While in the bedroom, Ms. Jones heard shots being fired. She then saw Mr. Montgomery come down the hall, enter the bathroom and shut the door. Ms. Jones and Mr. Herring got into his car. Mr. Herring drove down the road a mile or two to a convenience store. They went into the store and called an ambulance. Ms. Jones waited on the ambulance and flagged it down when it approached the convenience store. She got into the ambulance and rode in the ambulance back to her house.

The pipe was left on the floor but Ms. Jones does not know how.

Ms. Jones claimed at the criminal trial that she was in a total state of shock when she first talked with the police. She denies telling the police that Mr. Herring forced her into the car after the shooting. At that point in Ms. Jones's testimony, the prosecution claimed surprise, by virtue of the material variance between Ms. Jones's testimony and the statement given by Ms. Jones to the police immediately following the shooting. The Court granted the prosecution the right to cross examine. Before the prosecution could resume its questioning of Ms. Jones, Mr. Herring agreed to plead guilty and the trial ended.

### 3. Ms. Jones's Deposition

The deposition given by Ms. Jones in Mr. Montgomery's civil case is a composite of her first two statements. At the time the deposition was taken, Ms. Jones was still living with Mr. Herring and ostensibly had, by then, given birth to their child. She described her relationship with Mr. Herring at the time of the deposition by stating that she was living with him as his common law wife.

Ms. Jones began by explaining that she and Mr. Herring met Mr. Montgomery a year or a year and a half before the shooting. Ms. Jones, Mr. Herring and Mr. Montgomery were "good friends." Mr. Herring and Mr. Montgomery met socially several times a month. She and Mr. Herring had been divorced for approximately two months before the shooting. When asked if she dated Mr. Montgomery after her divorce from Mr. Herring, she stated that "we were good friends." She went out with Mr. Montgomery a few times. She does not know if Mr. Herring knew at the time that she was dating Mr. Montgomery but that Mr. Montgomery would, on occasion, take her to work when her car was in the shop. He carried her to work on four or five occasions.

Ms. Jones knew that Mr. Herring usually carried a pistol either on his person or in his truck. Most of the time he kept the pistol in his back pocket. When he would get in his truck, he would take the pistol out of his back pocket and when he would get out of the truck he would put it in his back pocket.

On the morning of the shooting, Ms. Jones woke up and helped her six year old daughter prepare for school. After her daughter left on the school bus, Ms. Jones talked to Mr. Herring on the phone. She could not recall whether he called her or she called him but that Mr. Herring came to her house around 7:00 a.m. He parked in the driveway and entered through the front door. The front door was open. The storm door was closed but unlocked. She and Mr. Herring talked and went to bed together. Mr. Herring left her house around 8:30 a.m. Mr. Montgomery later came to her house and asked her if she needed a ride to work. Ms. Jones told Mr. Montgomery, "No, my brother is taking me." She let him in and he sat on the couch in the living room. Although her car was in the shop, she had not called Mr. Montgomery. Her brother, Brian Jones, had called her while Mr. Herring was in the house and was supposed to take her to work.

After Mr. Montgomery came in and sat on the couch, Mr. Herring arrived. Mr. Herring parked in the driveway, which Ms. Jones described, "I could see that he parked in the driveway from the front window." In response to the question, "Did you see him [Mr. Herring] come up?" Ms. Jones stated, "I looked out the front window and seen his car and then when I come from the living room to the hall area where you could see the living room and the kitchen where the back door—I seen him come up then." She did not say anything to Mr. Herring then, but told Mr. Montgomery, "There is Robby." She was nervous when she said it because she knew that the two did not get along, and stated, "Because during the time that we were separated Benny had told me some stuff that when we were going through the divorce that Robby had said about me or was going to do or—and him and Benny weren't talking." She had never heard Mr. Herring threaten Mr. Montgomery and he had never threatened her or indicated to her that he intended to harm Mr. Montgomery. Mr. Herring had called and talked to her about the possibility of them getting back together.

Ms. Jones could not recall whether she locked the front door. Without knocking,

Mr. Herring came in the back door, which is a sliding glass door. The back door was closed but unlocked. When Mr. Herring came in, Mr. Montgomery got up from the couch. When Mr. Herring came into the kitchen, Mr. Montgomery retrieved a pipe. Ms. Jones was not sure where Mr. Montgomery found the pipe, but believes that it came from the pantry where her washer and dryer were located.

Mr. Herring and Mr. Montgomery met at the doorway between the kitchen and the living room and began fighting. She saw Mr. Herring's pistol in his back pocket. When she first saw them fighting she was in the hallway and they were in the living room close to the doorway between the kitchen and living room. She saw part of the fight but not all of it, and did not see the fight begin. She told them to stop fighting or she was going to call the police.

They were fighting with their hands; pushing one another and hitting each other with their fists. At some point during the fight, she went into the back bedroom "where the telephone was at in my room," to call the police. Ms. Jones is not sure when Mr. Montgomery struck Mr. Herring with the pipe, whether it was before she went into her bedroom or after she came out of her bedroom, but when Mr. Montgomery had the swing set brace in his hand, Mr. Herring had the gun out in his right hand. Mr. Herring hit Mr. Montgomery once or twice in the head with the pistol. Mr. Montgomery hit Mr. Herring two or three times with the swing set brace and then the brace fell. Mr. Montgomery ran into the kitchen, a distance of around six feet, picked up a bar stool, came back and hit Mr. Herring with the bar stool. She could not see Mr. Herring during the time that Mr. Montgomery left to get the stool.

When Ms. Jones went into her bedroom and got her telephone, she took it into the bathroom, where she was when the shots were fired. She did not see Mr. Herring shoot Mr. Montgomery because she was in the bathroom at the time, but heard the shots. She left the bathroom and went into her bedroom. She then saw Mr. Montgomery come down the hall bloodied. He entered the bathroom and told her to call the police. Ms. Jones walked out into the living room.

After the shooting Ms. Jones and Mr. Herring left the house, got into Mr. Herring's car, went to a store and called an ambulance. A worker at the store dialed the number and handed Ms. Jones the phone. Ms. Jones requested the ambulance. Mr. Herring also asked for the phone so that they could call an ambulance. When the ambulance came by the store, Ms. Jones got in.

Prior to the shooting, Ms. Jones had never heard her mother tell Mr. Herring not to come to her house. Ms. Jones's mother never told her that she had told Mr. Herring not to come to the house. On one occasion, Mr. Herring came to the house and brought her some roses and they sat on the porch and talked and her mother did not say anything. After the divorce, she and Mr. Herring talked over the phone several times and in person at her mother's house on about five occasions. On one occasion she went to his house. She and Mr. Herring talked on the phone the week before the shooting. She did testify that her mother obtained an unlisted phone number around ten days before the shooting because she did not want Mr. Herring calling her.

Three weeks before the shooting, Mr. Montgomery was at her house. Mr. Herring came to the door and knocked. No one answered the door. When she and Mr. Montgomery left the house to take her daughter to school, Mr. Montgomery's car had a flat tire.

### D. Ms. Peggy Jones's Testimony

Ms. Jones's mother, Ms. P. Jones, was not called to testify, but the testimony given by her at Mr. Herring's criminal trial is contained in the transcript placed into evidence by stipulation of the parties. Ms. P. Jones testified at the criminal trial that Ms. Jones came to live with her in the latter part of July, 1988, after Ms. Jones's divorce from Mr. Herring. Ms. P. Jones testified that she did not like Mr. Herring because he beat Ms. Jones while they were married. Ms. P. Jones said that the final incident leading to the divorce was when Mr. Herring beat Ms.

Jones because of an argument over a vegetable garden.

After Ms. Jones's divorce from Mr. Herring, Ms. P. Jones would not let Mr. Herring come to her home. She told him repeatedly on the telephone not to come to her home. When Mr. Herring came to her home two or three weeks before the shooting to retrieve a gun of his in Ms. Jones's possession, Ms. P. Jones would not let him come in the house, but made Ms. Jones go to the steps and talk to Mr. Herring where she could see them.

To Ms. P. Jones's knowledge, Ms. Jones had not been talking to Mr. Herring on the telephone prior to the shooting and had not been seeing Mr. Herring away from the house during that time period, and was not planning on reviving their relationship. Mr. Herring had been continuously calling the house during the time after the divorce. Ms. P. Jones stated, "[i]t had just been a continuous thing, calling night and day, all night long, all day long, three or four o'clock in the morning...." Because of Mr. Herring's incessant calling, *Ms. Jones* had the phone number changed to an unlisted number about ten days prior to the shooting.

Ms. P. Jones was at work when the shooting occurred. She received a phone call from Ms. Jones at around 9:40–9:45 a.m. Ms. Jones was upset. Upon completing the phone call, Ms. P. Jones left work and drove to her home. On the way, she passed Mr. Herring in his car about three miles from her home.

Ms. P. Jones identified the swing set brace which she said was customarily kept in the utility space along with the washer and dryer. The brace was in its customary place when she last saw it.

Mr. Herring did not have permission to be in her home on the occasion of the shooting. Her daughter and her granddaughter and Mr. Montgomery all told her that Mr. Herring slashed Mr. Montgomery's tire one day about a month before the shooting. Ms. P.

Jones saw the tire and saw that it had been cut. In February, 1989, Ms. Jones left Ms. P. Jones's house to live with Mr. Herring.

## II. CONCLUSIONS OF LAW

### A. Section 523(a)(6)

■ Section 523(a)(6) of the Bankruptcy Code makes a debt nondischargeable for any "willful and malicious" injury caused by a debtor to another person. The definitions of both "willful" and "malicious" are legal terms of art and have long been established and recognized in this circuit. They are described as:

> In order that a provable liability come within this exception the injuries must have been both willful and malicious. An injury to person or property may be a malicious injury within this provision if it was wrongful and without just cause or excuse, even in the absence of personal hate, spite or ill will. The word "willful" means nothing more than intentionally doing an act which necessarily leads to injury. Therefore, a wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse, may constitute a willful and malicious injury.

*In re Vickers*, 546 F.2d 1149, 1150 (5th Cir. 1977).[1] Mr. Herring admits that he intentionally shot Mr. Montgomery with a pistol. The necessary and certain result of that act was injury to Mr. Montgomery. "Malice may be inferred from the use of a deadly weapon." *In re Rice*, 18 B.R. 562, 565 (Bankr.N.D.Ala.1982).[2] Because the only conceivable purpose that Mr. Herring would have in intentionally shooting Mr. Montgomery would be to inflict harm, this Court concludes that the shooting was an inherently malicious act done intentionally which produced harm. In the absence of a legal justification or excuse the act would also be "willful and malicious" under section 523(a)(6) of the Bankruptcy Code.[3]

---

1. *See also In re Walker*, 48 F.3d 1161, 1164 (11th Cir.1995); *In re Ikner*, 883 F.2d 986, 991 (11th Cir.1989); *In re Latch*, 820 F.2d 1163, 1166 n. 4 (11th Cir.1987); *In re Dardar*, 620 F.2d 39, 40 (5th Cir.1980).

2. The use of a deadly weapon raises a legal presumption of malicious intent. *Snipes v. State*, 364 So.2d 424, 426 (Ala.Crim.App.1978).

3. A debt resulting from an intentional assault and battery is a "willful and malicious injury"

under Section 523(a)(6), in the absence of legal justification or excuse. *See, e.g., In re Thirtyacre*, 36 F.3d 697 (7th Cir.1994) (where debtor intentionally struck victim in the neck, absent legal justification or excuse, act was malicious and resulting debt was nondischargeable); *In re LeMaire*, 898 F.2d 1346 (8th Cir.1990) (where debtor shot plaintiff five times at close range with a rifle in an attempt to kill the plaintiff, resulting debt would be nondischargeable in Chapter 7, and debtor's Chapter 13 plan, which proposed to pay 42% of debt was not proposed in good faith); *In re Pitner*, 696 F.2d 447 (6th Cir.1982) (debt resulting to widow when debtor shot victim in the stomach, a wound from which the victim later died, was nondischargeable); *In re Dardar*, 620 F.2d 39 (5th Cir.1980) (absent legal justification or excuse, intentional beating of victim by debtor was malicious and resulting debt was nondischargeable); *In re Vickers*, 546 F.2d 1149 (5th Cir.1977) (absent legal justification or excuse, intentional stabbing of victim by debtor was malicious and resulting debt was nondischargeable); *In re Seals*, 110 B.R. 331 (M.D.Tenn.1989) (where debtor choked, kicked, beat, kneed and threw the plaintiff around her own apartment, debt based on injuries thereby received by the plaintiff was nondischargeable); *In re Gaebler*, 88 B.R. 62 (E.D.Pa.1988) (debt resulting from intentional shooting of victim by debtor without legal cause or excuse was nondischargeable); *In re Chase*, 43 B.R. 739 (D.Md. 1984) (where debtor sexually abused minor, resulting debt was nondischargeable in Chapter 7, and debtor's Chapter 13 plan, which proposed to pay a third of the state court consent judgment entered against the debtor in an action based upon the illicit act over five years would not be confirmed); *In re Ertz*, 28 B.R. 1020 (D.S.D. 1983) (where debtor struck plaintiff in the face, without legal justification, causing plaintiff to fall and strike his head on the ground, the resulting debt was nondischargeable); *In re Staggs*, 178 B.R. 767 (Bankr.N.D.Ind.1994) (debt resulting when debtor intentionally assaulted the plaintiff was nondischargeable); *In re Williams*, 173 B.R. 912 (Bankr.W.D.Ark.1994) (debt resulting when debtor intentionally assaulted the plaintiff was nondischargeable); *In re Perretti*, 172 B.R. 214 (Bankr.N.D.Ohio 1994) (debt resulting when debtor struck plaintiff in the face was nondischargeable, where evidence did not support debtor's claims of self defense and "mutual combat"); *In re Hazard*, 166 B.R. 145 (Bankr.E.D.Mo.1994) (debt resulting when debtor intentionally assaulted the plaintiff was nondischargeable); *In re Bumann*, 147 B.R. 44 (Bankr.D.N.D.1992) (debt resulting when debtor instigated fight with plaintiff and struck plaintiff in the face was nondischargeable, even though plaintiff fought back and struggled with debtor after fight began); *In re Pokorny*, 143 B.R. 179 (Bankr.N.D.Ill.1992) (where debtor intentionally struck the plaintiff in the face with his fists, the resulting debt was nondischargeable, even if debtor was incited by ethnic slurs, since mere verbal abuse is not legal justification for assault); *In re McCown*, 129 B.R.

432 (Bankr.D.Md.1991) (debt resulting when debtor police officer shot minor suspect three times was nondischargeable, where minor suspect was unarmed and the circumstances did not warrant a reasonable belief by the officer that he was in imminent danger from the minor); *In re Camden*, 115 B.R. 156 (Bankr.S.D.Ill.1990) (debt resulting when debtor intentionally shot her former boyfriend in the stomach was nondischargeable); *In re Tuma*, 111 B.R. 323 (Bankr.D.Mont. 1990) (debt resulting when the debtor struck the plaintiff in the mouth with his fist, was nondischargeable, where debtor had not acted in self defense); *In re Johnson*, 109 B.R. 885 (Bankr. N.D.Ind.1989) (debt resulting when debtor shot plaintiffs was nondischargeable, even though debtor purported to have believed at the time that the plaintiffs were burglars who had broken into his home, where debtor's belief was incorrect and unreasonable); *In re Baker*, 108 B.R. 663 (Bankr.S.D.Ill.1990) (where debtor intentionally stabbed plaintiff in the stomach, resulting debt was nondischargeable); *In re Rubitschung*, 101 B.R. 28 (Bankr.C.D.Ill.1988) (where debtor struck the plaintiff with a bottle in the face, rendering the plaintiff unconscious, resulting debt was nondischargeable); *In re Morton*, 100 B.R. 607 (Bankr.N.D.Ga.1989) (debt resulting when debtor, without just cause or excuse, pointed loaded gun at victim's head and threatened to kill her, struck the victim repeatedly about the head and choked her, and shot victim in the shoulder, was nondischargeable); *In re Swan*, 98 B.R. 502 (Bankr.D.Neb.1989) (where debtor intentionally assaulted the plaintiff, resulting debt was nondischargeable in Chapter 7, and debtor's Chapter 13 plan, which proposed to pay $90 toward an $8000 state court consent judgment entered against the debtor in an action based upon the assault over three years would not be confirmed); *In re Nunez*, 95 B.R. 566 (Bankr.N.D.Ill.1988) (debts resulting when debtor struck and kicked two police officers following his arrest were nondischargeable); *In re Gonsor*, 95 B.R. 123 (Bankr.D.S.D.1988) (where debtor kicked plaintiff in the groin and broke plaintiff's jaw with his fist, resulting debt was nondischargeable); *In re Cobley*, 89 B.R. 446 (Bankr. E.D.Pa.1988) (debt resulting when debtor, a prison guard, beat plaintiff inmate with a broomstick, causing the plaintiff to lose an eye, was nondischargeable, where court found that debtor had not acted in self defense); *In re Buroker*, 72 B.R. 993 (Bankr.S.D.Ohio 1987) (where debtor went to plaintiff's home, demanded entrance into the premises, threatened plaintiff, fired three shots through the plaintiff's door and window, one of which struck the plaintiff, resulting debt was nondischargeable); *In re Siefke*, 61 B.R. 220 (Bankr.D.Mont.1986) (beating administered by debtor to police officer, who was attempting to arrest the debtor for driving under the influence of alcohol, resulted in nondischargeable debt); *In re Cunningham*, 59 B.R. 743 (Bankr.N.D.Ill. 1986) (where debtor intentionally stuck victim in the face, act was malicious and resulting debt was nondischargeable); *In re Domingue*, 59 B.R.

5 (Bankr.M.D.La.1986) (debt resulting when debtor, in a fit of rage, attacked the plaintiff and bloodied his nose was nondischargeable, where testimony of disinterested witnesses supported plaintiffs version of the events, and court disbelieved debtor's testimony that he was acting in defense of his wife); *In re Czanik,* 51 B.R. 637 (Bankr.S.D.Ohio 1985) (debts created, if any, when plaintiff was thrown from hood of vehicle being driven by debtor, and later, at debtor's home was shot with a handgun in the foot by the debtor, were dischargeable, where actions by debtor which caused plaintiff's injuries were taken in response to plaintiff's aggression against the debtor); *In re Wilson,* 49 B.R. 952 (Bankr.M.D.Ala.1985) (debt resulting when debtor shot the plaintiff in the groin with a shotgun was nondischargeable, where court found that debtor had not acted in self defense and that shooting was not accidental); *In re Sturtevant,* 49 B.R. 310 (Bankr.D.Mass.1985) (where debtor intentionally pushed victim off a porch, punched and kicked victim, and hit her repeatedly about the head, shoulders, and back with a two-by-four, resulting debt was nondischargeable); *In re Nuckols,* 47 B.R. 731 (Bankr.E.D.Va.1985) (debt resulting when debtor punched and kicked plaintiff in the arms and legs, and grabbed plaintiff by the leg and pulled her from bed, causing her to land on the floor in manner that broke her leg, was nondischargeable, where evidence failed to support debtor's claim of self defense); *In re Chapman,* 46 B.R. 90 (Bankr.N.D.Ohio 1985) (conduct of debtor in violently and repeatedly kicking victim in the head while victim was lying helplessly face down in the street was malicious and could not be construed as self defense, so that resulting debt was nondischargeable); *In re Wade,* 44 B.R. 884 (Bankr. M.D.Fla.1984) (claim for damages resulting from debtor's unjustified attack on police officer who had stopped debtor for traffic violation was nondischargeable); *In re Moccio,* 41 B.R. 268 (Bankr. D.N.J.1984) (debt resulting when the debtor hit the plaintiff in the eye with his fist, was nondischargeable, where plaintiff had not voluntarily entered the affray with the debtor); *In re Slee,* 40 B.R. 825 (Bankr.D.Vt.1984) (debt resulting when the debtor broke the plaintiff's jaw with his fist, was nondischargeable, where debtor had not acted in self defense); *In re Weathers,* 40 B.R. 634 (Bankr. W.D.Mo.1984) (where, after plaintiff police officer stopped the car in which the debtor was riding, debtor persisted in approaching officer, after being commanded to "get back," so that officer was forced to grab the debtor, and debtor then struck the officer in the head and kicked him in the groin, resulting in injuries to the officer, debt to officer was nondischargeable); *In re Beach,* 39 B.R. 56 (Bankr.W.D.Ky.1984) (where debtor, during middle of a fistfight in front of a tavern, procured a shotgun from his car and discharged the shotgun in the direction of the tavern, seriously wounding a waitress, the debt resulting to the waitress was nondischargeable); *In re Smith,* 37 B.R. 996 (Bankr.M.D.Tenn.1984) (debt resulting when debtor intentionally assaulted the plaintiff was nondischargeable); *In re Hines,* 37 B.R. 553 (Bankr. E.D.Tenn.1984) (debt resulting when debtor punched plaintiff in the face and broke his nose, was nondischargeable, where evidence failed to support debtor's claim of self defense); *In re Trudeau,* 35 B.R. 185 (Bankr.D.Mass.1983) (debt resulting when debtor punched plaintiff in the face, causing two cuts above his right eye, was nondischargeable, where purported verbal provocation on the part of plaintiff did not rise to level of legal justification for the beating); *In re Rizo,* 34 B.R. 886 (Bankr.D.Col.1983) (debt resulting when debtor intentionally struck victim with a pool stick was nondischargeable); *In re Mueller,* 34 B.R. 869 (Bankr.D.Col.1983) (where debtor fired pistol at automobile occupied by plaintiffs, hitting one of the plaintiffs in the arm and the other in the calf, resulting debts were nondischargeable); *In re Rodgers,* 33 B.R. 324 (Bankr.S.D.Ohio 1983) (where debtor intentionally bit off a portion of the plaintiff's ear, resulting debt was nondischargeable); *In re Bothwell,* 32 B.R. 617 (Bankr. N.D.Iowa 1983) (absent showing of legal justification or excuse, act of debtor in throwing keys at former boyfriend, striking him in right eye and causing loss of vision, was malicious and resulting debt was nondischargeable); *In re Irvin,* 31 B.R. 251 (Bankr.D.Col.1983) (where debtor intentionally stabbed plaintiff, resulting debt was nondischargeable, absent legal excuse); *In re LaCasse,* 28 B.R. 214 (Bankr.D.Minn.1983) (where debtor intentionally discharged shotgun into plaintiff's parked camper, debt resulting from damage to camper was nondischargeable); *In re Goyne,* 26 B.R. 47 (Bankr.E.D.Va.1982) (debt resulting when the debtor broke the plaintiff's jaw with his fist, was nondischargeable); *In re Dilley,* 25 B.R. 179 (Bankr. W.D.Wis.1982) (debt resulting, if any, when the debtor broke the plaintiff's jaw with his fist, was dischargeable, where debtor acted in self defense); *In re Greig,* 21 B.R. 583 (Bankr.D.Me.1982) (debt resulting when the debtor struck the plaintiff with his fists, knocking the plaintiff unconscious, was nondischargeable); *In re Adams,* 21 B.R. 301 (Bankr.N.D.Ohio 1982) (where, after the plaintiff struck the debtor with his fists, the debtor left the premises and returned with a concealed revolver, and the revolver fell to the floor, whereupon the two men struggled over the gun, during which time two shots were fired from the gun, one of which entered the plaintiff's abdomen, the resulting debt was nondischargeable); *In re Rice,* 18 B.R. 562 (Bankr.N.D.Ala.1982) (where debtor fired pistol at intended victim, but hit an innocent bystander, act was malicious and resulting debt was nondischargeable); *In re White,* 18 B.R. 246 (Bankr. E.D.Va.1982) (debt resulting to innocent bystander who was shot when debtor fired pistol at intended victim but missed was nondischargeable, where court found debtor's claim that pistol went off accidentally when he tripped on a rock to be unbelievable); *In re Lewis,* 17 B.R. 341 (Bankr.S.D.Ohio 1982) (debt resulting when debtor, without justification, grabbed the plaintiff

## B. Is Mr. Herring's Claim of Self Defense a Legal Justification or Excuse?

Mr. Herring contends that he acted in self defense in shooting Mr. Montgomery. If he did, such a defense would be a legal justification or legal excuse for the shooting. But for this court to agree that Mr. Herring was so justified in shooting Mr. Montgomery, it must find that Mr. Herring did not provoke or bring on the difficulty which culminated in the shooting.[4] The facts indicate otherwise.

### (1) Mr. Herring's Actions

### (a) Before the Shooting

 Mr. Herring's actions before the shooting clearly indicate that he was the aggressor on the occasion in question. According to Mr. Montgomery's testimony and the statement Ms. Jones gave to the police following the shooting, Mr. Herring had threatened to kill Mr. Montgomery prior to the shooting.[5] According to Ms. P. Jones's testimony in the criminal trial, Mr. Herring had continuously called her house at all hours of the night and day in an effort to speak with Ms. Jones. According to Ms. Jones's deposition and her statement to the police, Mr. Herring vandalized Mr. Montgomery's automobile on a prior occasion when Mr. Herring found Mr. Montgomery visiting Ms. Jones at the house. According to Mr. Montgomery's testimony, and Ms. Jones's statement to the police, Mr. Herring sneaked in the house through the back door, unannounced, with gun in hand. All of these actions demonstrate Mr. Herring's apparent desire for and acts of possessiveness toward Ms. Jones, and when coupled with actions against Mr. Montgomery they illustrate jealousy and provided ample motive.[6] Under these circumstances, this Court concludes that Mr. Herring instigated the difficulty which resulted in Mr. Montgomery's injuries and that he cannot claim legal justification based upon self defense.[7]

---

around the neck and threw her to the ground, was nondischargeable); *In re Smith,* 2 B.R. 30 (Bankr. S.D.Fla.1979) (debt resulting when debtor intentionally assaulted the plaintiff was nondischargeable); *In re Truesdail,* 1 B.R. 130 (Bankr.E.D.Mich. 1979) (where debtor entered into drinking establishment and brandished a pistol, and began swinging the pistol about wildly, and threatening to shoot the pistol, whereupon the pistol struck a patron in the face, resulting debt was nondischargeable).

4. *United States Steel Co. v. Butler,* 260 Ala. 190, 194, 69 So.2d 685, 689 (1953); *Sanders v. State,* 242 Ala. 532, 534, 7 So.2d 483, 484 (1942); *Shack v. State,* 236 Ala. 667, 668, 184 So. 688 (1938); *Harris v. Wright,* 225 Ala. 627, 630, 144 So. 834 (1932); *Mount Vernon–Woodberry Mills v. Little,* 222 Ala. 605, 608–609, 133 So. 710 (1931); *Cain v. Skillin,* 219 Ala. 228, 232, 121 So. 521 (1929); *Ashworth v. Alabama Great Southern R. Co.,* 211 Ala. 20, 25, 99 So. 191 (1924); *Bean v. Stephens,* 208 Ala. 197, 199, 94 So. 173 (1922); *Brewer v. Varner,* 207 Ala. 466, 469, 93 So. 448 (1922); *South Brilliant Coal Co. v. Williams,* 206 Ala. 637, 638, 91 So. 589 (1921); *Riley v. Denegre,* 201 Ala. 41, 77 So. 335 (1917); *Kilgore v. State,* 643 So.2d 1015, 1018 (Ala.Crim. App.1993); *Austin v. State,* 555 So.2d 324, 329 (Ala.Crim.App.1989); *Weaver v. State,* 500 So.2d 1278, 1279 (Ala.Crim.App.1986); *Finchum v. State,* 461 So.2d 37, 39 (Ala.Crim.App.1984); *Thompson v. State,* 418 So.2d 226, 227 (Ala.Crim. App.1982); *McDonald v. State,* 340 So.2d 80, 84 (Ala.Crim.App.1976); *Bell v. State,* 339 So.2d 96, 97 (Ala.Crim.App.1976); *Moore v. State,* 40 Ala. App. 121, 123, 108 So.2d 382, 384 (Ala.Ct.App.

1959); *Conley v. State,* 38 Ala.App. 618, 620, 92 So.2d 7, 9 (Ala.Ct.App.1956); *Jones v. State,* 37 Ala.App. 467, 468, 70 So.2d 543, 544 (Ala.Ct. App.1954); *Gafford v. State,* 37 Ala.App. 377, 379, 68 So.2d 858, 859 (Ala.Ct.App.1953).

5. "In a charge of homicide or assault, a threat by the accused to kill or injure the victim is admissible as tending to show a design in the accused to commit the crime and, hence, as tending to show his commission of the crime." C. Gamble, *McElroy's Alabama Evidence* § 44.02(1) (4th Ed.1991).

6. "On the issue of whether a person did a specified act, or whether a specified act assumed as having been done by him was done intentionally or accidentally, evidence of a motive in him to do or not to do such act is admissible." C. Gamble, *McElroy's Alabama Evidence* § 45.01(1) (4th Ed.1991). Jealousy is often at the root of assault and murder. "Jealousy is the rage of a man: therefore he will not spare in the day of vengeance." Proverbs 6:34.

7. *United States Steel Co. v. Butler,* 260 Ala. 190, 194, 69 So.2d 685, 689 (1953) (despite claim of self defense, wrongful death jury verdict upheld against four deputies who, without a warrant, accosted the deceased, who was in a place he had a right to be, for the purpose of identifying him, and killed the deceased, after the deceased purportedly attempted to draw a pistol); *Sanders v. State,* 242 Ala. 532, 534, 7 So.2d 483, 484 (1942) (in murder prosecution, defendant was properly precluded from offering evidence of prior difficulty with the deceased, where testimony indicated that defendant and deceased had an

### (b) Surrounding the Shooting

Mr. Herring's claim that he returned to the house and entered the house for the purpose of retrieving his house keys is contrary to the other facts before this Court, especially considering that neither he nor anyone else ever found the keys. And even if this Court were to accept Mr. Herring's claim regarding the keys, Mr. Herring had no reason to enter Ms. Jones's house especially after Ms. P. Jones had, on previous occasions, instructed him not to enter. He could have simply knocked on the front door and asked Ms. Jones to retrieve his keys. Since the house is small, he could have called through the back door, which he claims was slightly open, and asked Ms. Jones to retrieve his keys. Instead, and rather than knocking openly on the front door, Mr. Herring entered through the back door, without announcing his presence and apparently for the purpose of catching Mr. Montgomery unaware. Mr. Herring's claim that he entered the back door because he saw Ms. Jones at the back door when he drove up is unconvincing. In not one of her three statements did Ms. Jones indicate that she had been at the back door during the moments between the time Mr. Montgomery entered the house and when Mr. Herring arrived. Also, when questioned in a deposition taken as part of Mr. Montgomery's civil action as to why he did not enter the house through the front door, Mr. Herring responded: "Just did. This door or that door the same," and made no mention of Ms. Jones being at the back door.

Mr. Herring was in the habit of carrying a pistol in his truck and on his person. Ms. Jones said that most of the time Mr. Herring kept the pistol in his back pocket but that

argument after which the defendant went home and armed himself with a shotgun, and proceeded down the street to find the deceased to settle the trouble between them, and upon finding the deceased, killed him with the shotgun, even though, at the time, the deceased was armed with a knife and was advancing on the defendant); *Shack v. State*, 236 Ala. 667, 668, 184 So. 688 (1938) (defendant was properly convicted of homicide, despite plea of self defense, where defendant testified that he bought a box of snuff at a store but left it on the counter; that the deceased took the snuff, placed it in his pocket and left the store; that he accosted the deceased, demanded the return of the snuff, and placed his hand in the deceased's pocket to retrieve the snuff; that the deceased drew a knife whereupon the defendant also drew a knife and stabbed the deceased); *Austin v. State*, 555 So.2d 324, 329 (Ala.Crim.App.1989) (defendant who drove to house of man who was allegedly having an affair with his wife, and invited the man to fight, and crossed over into the man's yard, was not entitled to claim that he was acting in self defense in prosecution for assault); *Finchum v. State*, 461 So.2d 37, 39 (Ala.Crim.App.1984) (defendant, who, at night, followed victim in automobile, continuously flashing lights from dim to bright, and when unarmed victim stopped to question defendant regarding said activity through the open window of defendant's car, stabbed victim in the chest after victim had grabbed defendant's shirt, was properly convicted of assault in the first degree, despite claim of self defense); *Bell v. State*, 339 So.2d 96, 97 (Ala.Crim.App.1976) (defendant was properly convicted of homicide, despite plea of self defense, where defendant, after being thrown out of a night club by deceased, who was the manager, went home and retrieved a shotgun and returned to the club, and shot the deceased, even though the evidence indicated that deceased was also armed and had pulled a pistol and had it pointed in the defendant's direction when the fatal shots were fired by the defendant); *Moore v. State*, 40 Ala.App. 121, 123, 108 So.2d 382, 384 (Ala.Ct.App.1959) (defendant who entered back yard of daughter-in-law after being warned not to do so, armed with a pistol, and, after being told by the daughter-in-law to put the gun up and leave, shot daughter-in-law as she advanced upon him with a shovel, was not entitled to have jury instructed on law of self defense in prosecution for murder in the first degree); *Conley v. State*, 38 Ala.App. 618, 620, 92 So.2d 7, 9 (Ala.Ct.App.1956) (defendant in manslaughter prosecution, who, after altercation at a dance hall with the deceased, who had been living with the defendant's wife, retrieved a shotgun from his truck and walked to his wife's house, looking for the deceased, and upon running into the deceased, who was carrying a rifle, shot the deceased, who the defendant claims fired the first shot, was not entitled to jury instruction that if deceased had made sudden, unprovoked assault on defendant, defendant had no duty to retreat, but had the right to stand his ground and shoot the deceased); *Jones v. State*, 37 Ala.App. 467, 468, 70 So.2d 543, 544 (Ala.Ct. App.1954) (in prosecution for murder, trial court properly refused to admit evidence of the victim's purported reputation for violence, and properly refused to instruct the jury on the law of self defense, where evidence showed that defendant, after engaging in an argument and altercation with the deceased over a game of craps, which resulted in the deceased knocking the defendant down and kicking him in the face, left the house where the game was taking place, procured a gun, returned to the house, and shot the deceased after a scuffle over the weapon).

when he would get in his truck, he would take the pistol out of his back pocket. In this instance, Mr. Herring made a conscious decision to take the pistol out of his truck and into the house. In doing so, he bore the grave responsibility that one who carries a dangerous weapon bears.

Mr. Herring's contention that Mr. Montgomery spontaneously attacked him, without provocation or cause, is implausible. No testimony was presented which indicates that Mr. Montgomery was a violent person, or that Mr. Herring had reason to fear Mr. Montgomery or to think that Mr. Montgomery would have been armed with a dangerous weapon. Mr. Montgomery was in a place where he had a legal right to be and was, therefore, not required under the law to retreat from Mr. Herring's aggression. Mr. Herring, on the other hand, was not in a place that he was supposed to be. He had been directed by Ms. Jones's mother not to come to the house. The threats made by Mr. Herring to Mr. Montgomery, coupled with Mr. Montgomery's knowledge that Mr. Herring always carried a pistol, gave Mr. Montgomery ample reason to be alarmed at Mr. Herring's unannounced entry into the house.[8] The fact that Mr. Herring entered the house through the back door unannounced and armed with a pistol, supports Mr. Montgomery's assertions that Mr. Herring had threatened him on previous occasions and that Mr. Herring was in the habit of carrying a pistol about his person. Mr. Montgomery was reasonably justified in his belief that Mr. Herring snuck into the house to carry out his previous threats and that he, Mr. Montgomery, had no choice other than to defend himself.

Much of the remainder of Mr. Herring's testimony regarding the events which occurred following his entry into the house is not consistent with this Court's findings of fact. Mr. Herring testified that he was with Ms. Jones on the morning of the shooting, prior to Mr. Montgomery's arrival at the house. If that were true, then surely Ms. Jones would have given a statement to the police that would have been much more favorable to Mr. Herring, just as she did at the criminal trial and in her deposition. Mr. Herring testified that he entered the living room and was then hit with the swing set brace. That sequence of events would require Mr. Montgomery to have entered the kitchen, retrieved the swing set brace from the utility closet, and then retreated back into the hallway, all before Mr. Herring came in the back door. Both Mr. Montgomery and Ms. Jones, in her first and third statements, indicated that Mr. Montgomery went into the kitchen and got the brace after Mr. Herring had entered the kitchen through the back door. Mr. Herring, who is right handed, testified that by use of his left hand only, he tore the bar stool from Mr. Montgomery's grasp, even though Mr. Montgomery was holding the bar stool with both of his hands. It is more plausible that Mr. Montgomery's assertion, that he picked up the stool after he had been shot the first time, is closer to the truth. Mr. Herring testified that Ms. Jones willingly left with him following the shooting. The idea that Ms. Jones would willingly leave her home, and the home of her minor child, to go with Mr. Herring after he had just shot her boyfriend, and had shot holes in her mother's house, is not supported. It is much more likely, as Ms. Jones told the police, that she left with Mr. Herring out of fear that she would otherwise become his next object of violence.

#### (2) Physical Evidence

#### (a) Personal Injury

Photographs of Mr. Herring taken the afternoon of the day of the affray and photo-

---

8. Regardless of which version of the testimony is accepted, Mr. Montgomery's knowledge of the fact that Mr. Herring was in the habit of carrying a pistol helps explain Mr. Montgomery's actions when Mr. Herring entered the house. "If the evidence tends to show that the accused acted in self defense, the accused is entitled to prove that the deceased was in the habit of carrying firearms or other deadly weapons or that he had the reputation of habitually being armed." C. Gamble, *McElroy's Alabama Evidence* § 63.01(2) (4th Ed.1991). The testimony is relevant to support the contention that Mr. Montgomery was justified in taking prompt and aggressive action to defend himself when Mr. Herring entered the house, gun in hand, as is the testimony regarding the threats made by Mr. Herring to Mr. Montgomery. *Id.* at § 44.02(2). No objection was raised to the admissibility of either the testimony regarding Mr. Herring's habit of carrying a gun or the testimony regarding the threats.

graphs of Mr. Herring taken a week later were admitted into evidence. In each of the photographs, Mr. Herring is without a shirt. The photographs were introduced by Mr. Herring for the avowed purpose of illustrating a large bruise received by Mr. Herring on the back part of his left arm. Conspicuously absent from Mr. Herring's face and the remainder of Mr. Herring's upper body are any other marks, contusions, cuts, abrasions, bruises or other evidence that he had been hit or struck by Mr. Montgomery. Neither Mr. Herring nor his attorney identified anything in the photographs other than the bruise on Mr. Herring's left arm and no other marks are depicted in the photographs. The photographs show that, other than the bruise on his left arm, Mr. Herring was virtually unharmed in the fight. This contradicts Mr. Herring's claim that Mr. Montgomery hit him repeatedly about the face, shoulders, arms, chest and upper body with the swing set brace, his fists, the bar stool, and again with his fists. Instead, the photographs tend to support Mr. Montgomery's rendition of the fight, in which he did not recall striking Mr. Herring with either the swing set brace or the bar stool, and in which he stated that he thought that he had picked up the bar stool after he had been shot the first time.

### (b) Condition of the Scene

Photographs depicting the state of the living room, kitchen and hallway following the shooting were also admitted into evidence. The lack of marks or scars on the walls and ceilings in the photographs contradicts Mr. Herring rendition of the affray. A vigorous fight between two large men, both weighing about two hundred pounds, flailing about with a swing set brace and a bar stool, and slinging one another into walls, surely would have left some evidence of struggle on the walls and ceilings. Mr. Montgomery's rendition of the fight, in which the two men wrestled over the gun, and in which Mr. Montgomery did not recall striking Mr. Herring with either the swing set brace or the bar stool, is more believable. Several of the photographs show the bar stool lying in the floor of the *hallway*, where it was left after it was dropped by Mr. Montgomery. The position of the bar stool supports Mr. Montgom-

ery's belief that he picked up the bar stool after he had been shot the first time, and does not support Mr. Herring's testimony, in which he stated that while he was in the living room, he wrenched the stool from Mr. Montgomery's grasp and threw it on the floor. Mr. Herring testified that when he met Mr. Montgomery in the house, Mr. Montgomery was in the hallway and that Mr. Montgomery then swung the brace at him like a baseball bat. He testified further that Mr. Montgomery is approximately 6'3" tall and that the ceilings in the house are approximately 8' high. The photographs of the hallway prove it to be very narrow. The walls and ceiling would have prevented anyone standing in the hall from swinging the brace like a baseball bat, especially someone the size of Mr. Montgomery.

Several of the photographs show numerous bullet holes made in the walls and ceiling, as well as a mark on the refrigerator. There is a bullet hole in the living room wall approximately two and a half feet to the left of the doorway between the kitchen and the living room. There is a bullet mark on the lower right hand side of the refrigerator, which is located in the kitchen indirectly across the room from, and parallel to, the same doorway. There are two bullet holes about two or three inches apart, on the living room wall approximately one and a half feet to the right of the same doorway. There is a bullet hole on the lower part of the living room wall which runs from the front door perpendicular to the wall on which the doorway between the kitchen and living room is located. The hole appears to be about one and a half feet above the floor and about three feet before the wall ends at the corner of the living room and the hallway. One photograph depicts a bullet hole in the ceiling, but from the photograph the Court cannot determine which room is shown and the testimony offered did not clarify the point. Two bullets entered Mr. Montgomery's body.

According to Mr. Herring, all of the bullets were fired in quick succession, as he and Mr. Montgomery were grappling for the gun at a distance of no more than a foot or so apart as they were facing one another. The spacing of the bullet holes about the room and Mr.

Herrings's knowledge of guns, however, contradicts his account of the shooting. Mr. Herring and Mr. Montgomery met one another at a gun club. Mr. Herring frequently carried a pistol with him. This court will not assume that Mr. Herring was so incompetent in the use of that pistol that he would scatter 7 to 8 shots over a linear area of approximately fifteen feet while attempting to hit a 6′3″, 210 pound, target only a foot directly in front of him.

This Court finds it reasonable to assume that, if Mr. Herring had been acting solely in self defense, he would not have fired his pistol so many times. Logic dictates that it should have been unnecessary for Mr. Herring to have fired 7 or 8 bullets in order to dissuade the attack of an unarmed man. To the contrary, the sheer number of shots taken by Mr. Herring at Mr. Montgomery, coupled with the relatively large area over which the shots landed, indicates that Mr. Herring began firing on Mr. Montgomery once he was able to break Mr. Montgomery's grasp on his gun hand, and that as Mr. Montgomery attempted to avoid the gun shots by moving toward the hallway and the kitchen, Mr. Herring followed Mr. Montgomery with his weapon, firing repeatedly. The physical evidence, therefore, indicates that Mr. Herring was not merely defending himself but was the aggressor and came into the house with malicious intent.

### (3) Ms. Jones's Statement to the Police is Entitled to Greater Weight

The statement given by Ms. Jones to the police agrees with and supports Mr. Montgomery's testimony, and the Court finds that her statement is a true and unfabricated account of the events actually observed by Ms. Jones relevant to the shooting, even though the statement varies in material respects from the testimony given by her at the criminal trial and, to a lesser extent, with the testimony given by her in her deposition. The statement was given less than an hour following the shooting, while the events of the morning were still fresh on her mind. There was no testimony to indicate that Ms. Jones held any particular animosity toward Mr. Herring or that she otherwise had a reason to alter her understanding of the facts for the purpose of harming Mr. Herring. She had no opportunity to collaborate with Mr. Montgomery, who was at the time in surgery, or to discuss the events of the day with anyone, for that matter. If, as Mr. Herring contends, he was with Ms. Jones on the morning of the shooting prior to Mr. Montgomery's arrival at the house, Ms. Jones would certainly have had reason to protect Mr. Herring, so that anything she said to the police which implicated Mr. Herring as the aggressor in the incident, should be entitled to even greater weight.

On the other hand, the last two of Ms. Jones's statements regarding the incidents relevant to the shooting were made 8–9 months and 2 years following the day that Mr. Herring shot Mr. Montgomery. When both statements were made Ms. Jones was either living with Mr. Herring and was either pregnant with a child of which Mr. Herring was the father, or was the mother of the same child.

Ms. Jones's second and third statements contain so many contradictions that they are untrustworthy, especially considering her probable bias at the time those statements were given. Ms. Jones's second and third statements glaringly differ from her first statement in major aspects which directly relate to whether Mr. Herring was the aggressor on the occasion of the shooting. In her deposition, Ms. Jones denied that Mr. Herring ever told her that he was going to harm Mr. Montgomery and that her mother had forbidden Mr. Herring from coming on the property. In both the testimony given by her at the criminal trial and in her deposition, Ms. Jones claimed that Mr. Herring had been with her before Mr. Montgomery arrived; that Mr. Herring had the pistol in his pocket when he came into the house; and she denied that she went with Mr. Herring after the shooting because she was afraid of him. Otherwise, her second and third statements are, on many points, inconsistent with one another. In her second statement, Ms. Jones said that she did not see Mr. Herring arrive at the house and that Mr. Montgomery told her that Mr. Herring had arrived. In her third statement she stated that she saw Mr. Herring arrive and told Mr. Mont-

gomery that Mr. Herring had arrived. In her second statement, Ms. Jones said that she was either in the bedroom or the bathroom when Mr. Herring arrived. In her third statement she stated that she was in a position to see Mr. Herring "come up" to the back door, which means that she had to be somewhere near the doorway between the kitchen and the living room when Mr. Herring arrived, and that she was neither in the kitchen nor the bathroom at that point in time.

Ms. Jones testified at the criminal trial that Mr. Montgomery took the swing set brace from the "hall closet." There is, in fact, no hall closet in the house, and in her deposition Ms. Jones said that she thought Mr. Montgomery got the brace from the pantry in the kitchen where the washer and dryer are located. At the criminal trial, Ms. Jones testified that she did not lock the front door when Mr. Herring arrived the second time. In her deposition, Ms. Jones testified that she does not know if she locked the front door or not. Ms. Jones testified at the criminal trial that Mr. Montgomery "slung" the bar stool at Mr. Herring. In her deposition, Ms. Jones stated that Mr. Montgomery came back with the bar stool and began hitting Mr. Herring with it. Ms. Jones testified at the criminal trial that she was in the bedroom when the shots were fired. She stated in her deposition that she was in the bathroom when the shots were fired. At the criminal trial, Ms. Jones said that Mr. Herring left her house the first time no later than 9:15 a.m. and that Mr. Montgomery came to her house about ten minutes later. In her deposition, she said that Mr. Herring left her house around 8:30 a.m.

#### (4) Mr. Herring's Guilty Plea

Mr. Herring pled guilty to and was convicted of assault in the first degree. A person commits the crime of assault in the first degree in the state of Alabama if, with the intent to cause serious physical injury to another person, he causes serious physical injury to any person by means of a deadly weapon or a dangerous instrument. Code of Ala.1975, § 13A–6–20(a)(1). A person is legally justified in using deadly physical force on another if the actor reasonably believes that the other person is using or is about to use deadly physical force on him. Code of Ala.1975, § 13A–3–23(a)(1). However, a person is not justified in any circumstances to use physical force on another if he provoked the use of unlawful physical force by the other person or if he was the initial aggressor. Code of Ala.1975, § 13A–3–23(c)(1)–(2). Mr. Herring's conviction of the crime of first degree assault is evidence in this proceeding that Mr. Herring intended to cause serious physical injury to Mr. Montgomery by means of a deadly weapon and that he did in fact cause serious physical injury to Mr. Montgomery, and that he was not legally justified in doing so.[9]

9. "A person's conviction in a criminal case, whether his plea therein was guilty or not guilty, is admissible against him, as a general rule, in a civil case as tending to show that he did the act for which he was convicted, if such act is material to be proved in the civil action." C. Gamble, *McElroy's Alabama Evidence* § 269.05(1) (4th Ed.1991). Also, Fed.R.Evid. 803(22) provides that a final judgment of conviction, entered after trial or guilty plea, for a crime punishable by death or imprisonment for more than one year, is admissible in a subsequent proceeding to prove any fact that was essential to sustain the judgment.

The court is aware that in *In re Raiford,* 695 F.2d 521 (11th Cir.1983) the Court of Appeals for the Eleventh Circuit held that in certain circumstances, a criminal conviction based on a guilty plea may preclude by collateral estoppel the retrial of nondischargeability issues. However, in *Raiford,* the court indicated that a defendant in a criminal case could avoid collateral estoppel of the retrial of nondischargeability issues in the bankruptcy court by entering a plea of *nolo contendere* to the criminal charges:

A federal criminal defendant wishing to avoid both a trial and any collateral estoppel effects may ask for court permission to plead nolo contendere. A defendant who fails to exercise this option cannot argue subsequently that the lack of a contested trial renders his plea ineffective for collateral estoppel purposes.

695 F.2d at 523. In the state of Alabama, a criminal defendant may not plead *nolo contendere, May v. Lingo,* 277 Ala. 92, 167 So.2d 267 (1964), which leads this court to question the viability of *Raiford* to criminal convictions obtained in Alabama courts based upon guilty pleas. The parties have not made *Raiford* an issue in this case, and this court will not raise the issue on its own initiative, especially since the evidence indicates that the debt owed by Mr. Herring to Mr. Montgomery is nondischargeable, which is the result that application of *Raiford,* without consideration of the *nolo contendere* nuance, would seem to dictate.

### III. CONCLUSION

This Court finds that, according to the reliable evidence admitted in this case, Mr. Herring willfully and maliciously injured Mr. Montgomery. The debt owed to Mr. Montgomery as a result of that injury is, therefore, not dischargeable in bankruptcy under 11 U.S.C. § 523(a)(6). Mr. Montgomery will be allowed relief from the automatic stay to prosecute his pending state court case to conclusion. If the state court should enter judgment for damages for Mr. Montgomery and against Mr. Herring, the judgment will be unaffected by the discharge granted in this case.

A separate order will be entered in accordance with this opinion.