### In re Edward J. SARAMA, Debtor.

### MEMORIAL HOSPITAL, Plaintiff,

### v.

### Edward J. SARAMA, Defendant.

**Bankruptcy No. 94 B 16668.
Adversary No. 94 A 01873.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Feb. 29, 1996.

---

Jeffrey Hellman, Shipman & Goodman, Hartford, CT, Derrick M. Ford, Chicago, IL, for Memorial Hospital.

Karen Walin, Law Offices of Karen Walin, Orland Park, IL, for Edward J. Sarama.

## MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes before the Court on the complaint of Memorial Hospital ("Memorial") pursuant to 11 U.S.C. §§ 523(a)(2) and 523(a)(4) to determine the dischargeability of a debt owed to it by Edward J. Sarama (the "Debtor"). For the reasons set forth below, the Court holds that the debt plus interest

and costs is nondischargeable under §§ 523(a)(2) and 523(a)(4).

## I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334(b) and Local General Rule 2.33(A) of the United States District Court for the Northern District of Illinois. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## II. FACTS AND BACKGROUND

Most of the relevant facts and background are not in dispute. Memorial is an acute care general hospital which provides health care services, including out-patient emergency medical services. The Debtor is a doctor of osteopathy, specializing in emergency medicine, who was formerly under contract with Memorial to provide medical and administrative services to Memorial, and who headed its department of emergency medicine. The Debtor was also the sole shareholder and director of Memorial Emergency and Critical Care Associates, P.C. ("MECCA"), a professional corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 248 Brookwood Drive, York, Pennsylvania.

On July 1, 1987, Memorial entered into an agreement with the Debtor and MECCA for the purpose of securing exclusive emergency medical services from the Debtor and MECCA to Memorial's emergency medicine department. See Memorial's Exhibit No. 1. Pursuant to this agreement, MECCA contracted to provide physician coverage for Memorial's department of emergency medicine; MECCA and the Debtor then contracted with individual physicians to staff Memorial's emergency medicine department. In addition to the Debtor's duties under the agreement with Memorial, the Debtor was the chairman of Memorial's department of emergency medicine, and, as the director of the emergency residency program, was the person responsible for the training of all Memorial's emergency medicine residents. These residents were Memorial employees who were paid directly by Memorial. The agreement specifically provided that the Debtor

and MECCA were to provide emergency medical services only to Memorial and to no other hospital within a 60 mile radius of Memorial.

In August 1987, during the term of the Debtor's agreement with Memorial, the Debtor and MECCA entered into a contract for emergency medical services with Lebanon Valley General Hospital in Lebanon, Pennsylvania. See Debtor's Exhibit No. 1. Pursuant to that contract, the Debtor and MECCA were to provide emergency medical services to Lebanon Valley General Hospital, for which the Debtor and MECCA were paid. Although this agreement with Lebanon Valley conflicted with the exclusivity provision of the agreement with Memorial, Memorial expressly agreed to an exception to the exclusive service requirement under its agreement with the Debtor based upon the Debtor's representation that, among other things, performance under the Lebanon Valley contract would not affect physician coverage for Memorial's department of emergency medicine, and it would provide valuable additional educational training to Memorial's residents.

In 1988, the Debtor approached Polyclinic Medical Center ("Polyclinic") in Harrisburg, Pennsylvania for the purpose of negotiating a contract for the use of the Memorial emergency medicine residents at Polyclinic. This agreement was executed on March 7, 1989. See Memorial's Exhibit No. 2. The Debtor signed the Polyclinic contract on behalf of MECCA and as director of emergency medical services and program director of emergency medicine residency program at Memorial. The Debtor held himself out as the agent of Memorial and authorized to act on its behalf to enter into the contract. In discussions with Dennis Heinle ("Heinle"), Memorial's president and chief executive officer, the Debtor represented to Memorial that the only reason for using Memorial residents at Polyclinic was to provide Memorial residents with more specialized emergency medical training. The Debtor did not tell Memorial that Polyclinic had agreed to pay, and did pay, for the services of the residents. According to Heinle (but disputed by the Debtor), the Debtor never told Memorial about the payment terms of the contract with

Polyclinic. The Polyclinic contract negotiations were conducted principally between the Debtor and Polyclinic's vice president of administration and general in-house counsel, Brad Meneilly ("Meneilly"). The Debtor was the only representative of Memorial involved in the negotiations. He prepared the drafts of the Polyclinic agreement and related correspondence. Meneilly testified on deposition that Memorial, not MECCA, was the intended recipient of the fees it paid for the services of the Memorial residents. *See* Meneilly Deposition p. 27. This was corroborated by Norman G. Maxton ("Maxton"), Polyclinic's controller, who testified that it was his understanding that Memorial would supply its residents to cover Polyclinic's emergency room for which Polyclinic would reimburse Memorial. *See* Maxton Deposition p. 6. Maxton supervised the issuance and processing of checks issued by Polyclinic to pay for the services rendered under the Polyclinic contract. Maxton also stated that Memorial, not the Debtor nor MECCA, was the intended recipient of the Polyclinic payments. *See* Maxton Deposition p. 14–15.

From July 1, 1987 until July 1, 1991, the Debtor was in charge of all aspects of the emergency medicine program at Memorial. Accordingly, all mail relating to the emergency medicine program was routed to the Debtor. During the relevant period, the Debtor and MECCA maintained a money market account in MECCA's name with Merrill, Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"). During the period from March 7, 1989 until July 1, 1991, at the Debtor's request, Polyclinic paid approximately $161,248.00 to "York Memorial Osteopathic Residents Fund," "York Memorial Emergency Medical Residents Fund" and "York Memorial Emergency Residents Fund" per the direction of the Debtor. *See* Memorial's Exhibit No. 5. None of these named payees were separate legal entities. The return address on the envelopes in which the checks from Polyclinic were mailed was that of Polyclinic Hospital. The checks were received in the administrative office of Memorial, and were sometimes opened there. The administrative office then notified the Debtor that he should pick up the checks, which he did and utilized all the proceeds therefrom.

Memorial has never received any of the $161,248.00 in compensation which Polyclinic paid to the Debtor and MECCA during this period. Among other things, the Debtor used some of the money to pay his personal gambling debts as well as some expenses incurred by the residents. On June 26, 1991, Heinle and Dr. Richard DiPietro asked the Debtor whether or not he had ever personally benefitted or had been compensated by Polyclinic for the use of Memorial's residents. The Debtor expressly denied that he had ever personally benefitted from any payments made by Polyclinic. Not long thereafter, however, the Debtor admitted to Heinle and DiPietro that he had in fact personally benefitted from Polyclinic and received substantial payments from Polyclinic. Memorial claims it had no prior knowledge during the period from March 7, 1989 until June 26, 1991, that Polyclinic was paying the Debtor or MECCA for the services of Memorial's residents. Memorial never acquiesced either directly or implicitly in the payment arrangements the Debtor had made with Polyclinic. The Debtor's written agreement with Polyclinic was not furnished to Memorial until after June 26, 1991.

Pursuant to the complaint, Memorial seeks to have the $161,248.00 debt held nondischargeable under §§ 523(a)(2) and 523(a)(4). Memorial alleges that (1) the Debtor's representation that Memorial's employees, the emergency medical residents, were working at Polyclinic solely as a part of their training was false; (2) the Debtor failed to disclose to Memorial that Polyclinic was paying him and MECCA for the services of the Memorial residents; (3) the Debtor misappropriated funds Memorial was entitled to and Polyclinic intended to pay to Memorial; and (4) the Debtor illegally converted the funds paid for his own use, and thus, deprived Memorial of the money for services of its employees under false pretenses and through actual fraud. Moreover, Memorial alleges that the Debtor embezzled monies due it.

### III. *APPLICABLE STANDARDS*

The party seeking to establish an exception to the discharge of a debt bears

the burden of proof. *In re Martin,* 698 F.2d 883, 887 (7th Cir.1983). The burden of proof required for establishing an exception to discharge is a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 659–60, 112 L.Ed.2d 755 (1991). To further the policy of providing the debtor a fresh start in bankruptcy, exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor. *Meyer v. Rigdon,* 36 F.3d 1375, 1385 (7th Cir.1994); *In re Zarzynski,* 771 F.2d 304, 306 (7th Cir.1985).

## IV. DISCUSSION

### A. Section 523(a)(2)(A)

Section 523(a)(2)(A) provides in relevant part:

> (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—
>
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>>
>>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A).

■ Section 523(a)(2)(A) lists three separate grounds for dischargeability: actual fraud, false pretenses, and false representation. The Seventh Circuit requires the Court to apply a single test to prove the three types of misconduct even though intent is an integral part of "fraud" and not of "false pretenses" and "a false representation." *See Mayer v. Spanel Int'l Ltd. (In re Mayer),* 51 F.3d 670, 674–76 (7th Cir.), *cert. denied,* ―― U.S. ――, 116 S.Ct. 563, 133 L.Ed.2d 488 (1995); *see also Banner Oil Co. v. Bryson (In re Bryson),* 187 B.R. 939, 957–58 (Bankr.N.D.Ill.1995); *AT & T Universal Card Services v. Alvi and FCC Nat'l Bank v. Alvi (In re Alvi),* 191 B.R. 724, 728–30 (Bankr.N.D.Ill.1996).

■ In order to except "false pretenses," "fraud," or a "false representation" from dischargeability under § 523(a)(2)(A), Memorial must establish the following ele-

ments: (1) the Debtor obtained the funds at issue through false pretenses or representations he either knew to be false, or made with such reckless disregard for the truth as to constitute willful misrepresentations; (2) the Debtor possessed the requisite scienter, i.e., he actually intended to deceive Memorial; and (3) to its detriment, Memorial justifiably relied on the misrepresentations. *See Field v. Mans,* ―― U.S. ――, ――, 116 S.Ct. 437, 446, 133 L.Ed.2d 351 (1995); *Mayer,* 51 F.3d at 673; *In re Sheridan,* 57 F.3d 627, 635 (7th Cir.1995); *Goldberg Securities, Inc. v. Scarlata (In re Scarlata),* 979 F.2d 521, 525 (7th Cir.1992). An intent to deceive may be inferred from a false representation which the debtor knows or should know will induce another to advance money to the debtor. *First Nat'l Bank of Red Bud v. Kimzey (In re Kimzey),* 761 F.2d 421, 423–24 (7th Cir. 1985). Fraudulent intent can be established by circumstantial evidence. *Union Nat'l Bank of Marseilles v. Leigh (In re Leigh),* 165 B.R. 203, 215 (Bankr.N.D.Ill.1993); *Katahn Assocs., Inc. v. Wien (In re Wien),* 155 B.R. 479, 488 (Bankr.N.D.Ill.1993).

■ What constitutes "false pretenses" in the context of § 523(a)(2)(A) has been defined as "implied misrepresentations or conduct intended to create and foster a false impression." *Bryson,* 187 B.R. at 959 (quoting *Peterson v. Bozzano (In re Bozzano),* 173 B.R. 990, 993 (Bankr.M.D.N.C.1994)); *see also Itaparica, Ltd. v. Hargrove (In re Hargrove),* 164 B.R. 768, 772 (Bankr.N.D.Okla. 1994). The court in *Evans v. Dunston (In re Dunston),* 117 B.R. 632 (Bankr.D.Colo.1990), *aff'd in part, rev'd in part,* 146 B.R. 269 (D.Colo.1992), further defined "false pretenses" as follows:

> [A] series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor....
>
> A false pretense is usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and

misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend credit to the debtor. A "false pretense" is established or fostered willfully, knowingly and by design; it is not the result of inadvertence.

117 B.R. at 641. False pretenses do not necessarily require overt misrepresentations. Instead, omissions or a failure to disclose on the part of the debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor. *Bozzano,* 173 B.R. at 993.

■ With respect to the third element, the Court will consider the evidence in light of the recently articulated "justifiable reliance" standard enunciated in *Field,* rather than the higher burden of "reasonable reliance" set forth in *Kimzey* or the "actual reliance in fact" standard espoused in *Mayer.* According to the majority opinion in *Field,* "justifiable reliance" is a lower burden to prove than "reasonable reliance" and "does not mean that [the objecting creditor's] conduct must conform to the standard of the reasonable man." —— U.S. at ——, 116 S.Ct. at 444 (citation omitted).

Memorial alleges that the Debtor's receipt and use of Polyclinic's monies pursuant to the Polyclinic agreement for Memorial's residents' services constituted fraud and false pretenses because those funds should have been remitted to Memorial. The Debtor argues that his actions do not constitute fraud or false pretenses because he, through his professional corporation, MECCA, rightfully entered into the contract with Polyclinic, and he had disclosed the payment terms thereof. Thus, Memorial was not entitled to any monies received by the Debtor or MECCA pursuant to that agreement. Further, the Debtor maintains that because the Polyclinic agreement was similar to the agreement with Lebanon Valley Hospital, and Memorial was aware of the Polyclinic agreement, Memorial acquiesced in the payment terms of the Polyclinic agreement by failing to object until June 1991, and thereby waived the benefit of the exclusivity term in its agreement with the Debtor.

■ Initially, the Court will address the Debtor's argument that Memorial's allegations against the Debtor do not fall within the purview of § 523(a)(2) because the Debtor must obtain money from a creditor, and in this case, Memorial alleges that the Debtor obtained money from Polyclinic, not Memorial, by false pretenses and/or fraud. The Court finds that the Debtor's argument lacks merit. The Debtor diverted monies received from Polyclinic that Polyclinic intended for Memorial to pay for the services of Memorial's residents. Hence, Memorial is and was a creditor of the Debtor.

The Debtor cites a district court decision from the Middle District of Pennsylvania wherein Memorial sued Merrill Lynch for $161,248.00 for the handling of the checks issued by Polyclinic to the Debtor and the fictitious entities. *See Memorial Hospital v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* No. 1:CV–92–505 slip op. (M.D.Pa. Dec. 18, 1992). The Debtor cites this decision to show that this court rejected Memorial's argument that it was the intended recipient of the checks. The Court has carefully reviewed this decision and finds it inapposite. That matter and decision addressed the distinct issues of who was a proper party to bring a suit for conversion of the checks and for breach of warranty under Pennsylvania law and its version of the Uniform Commercial Code. In the instant adversary proceeding, however, Memorial is not suing a subsequent endorser on the checks, but rather, is suing the Debtor on the underlying fraud and embezzlement claims because the Debtor concealed the payment terms of the agreement between him and Polyclinic, and pocketed the proceeds of the Polyclinic checks intended for Memorial. Moreover, the Pennsylvania district court did not hold that Memorial was not the intended recipient of the funds. Rather, the court noted that "there is a distinction to be made between the owner of a check and the party with the right to the underlying funds." *Id.* at 5. The district court went on to state that "[a] claim to the funds is not the same as a claim to the check." *Id.* The court held only that Memorial was not the "true owner" of the checks for purposes of the suit brought against the

subsequent endorser of those negotiable instruments.

▆ Next, the Court will address the requisite elements under § 523(a)(2)(A). The first element Memorial must prove by a preponderance of the evidence is that the Debtor obtained the funds in question by representations he made to Memorial that he knew were false or were made with such reckless disregard for the truth as to constitute willful misrepresentation. The Debtor, purportedly on behalf of Memorial as well as MECCA, contracted with Polyclinic to provide Polyclinic with the services of Memorial's residents. The Debtor signed the agreement on behalf of MECCA and "Memorial Hospital Department of Emergency Medicine." Heinle testified that he was aware that Memorial's residents were spending time at Polyclinic, but he stated that he thought the arrangement was similar to that with other hospitals. Contrary to the Debtor's contention, Heinle emphatically stated that he was not aware that Polyclinic was paying MECCA and the Debtor for the use of Memorial's residents. He also testified that he, as Memorial's president and chief executive officer, not the Debtor, had the express authority to contract on behalf of Memorial. The Court finds Heinle's testimony credible on this crucial point, not the Debtor's statement. When the Debtor negotiated the agreement with Polyclinic he deliberately concealed from Memorial the fact that Polyclinic intended to pay for the residents' services.

The Court rejects the Debtor's argument that the Polyclinic agreement was similar to the Lebanon Valley agreement, and therefore, Memorial knew that the Debtor and MECCA were being paid. This argument ignores a crucial distinction between the Lebanon Valley contract and the Polyclinic contract. Both Heinle and the Debtor testified that the residents who worked at Lebanon Valley were paid for their services by MECCA, not Memorial. The Memorial residents who worked at Polyclinic, on the other hand, were paid by Memorial, not the Debtor or MECCA. Heinle testified that Memorial permitted its residents to work at Lebanon Valley for additional money when they were "moonlighting" or off duty, and thus not working at Memorial. Memorial, however, did not consent to permit the Debtor to use its residents, while being paid by Memorial and on duty for Memorial, albeit at another facility, to generate income for the Debtor and MECCA. Furthermore, Heinle testified that Lebanon Valley paid for the residents' services, and payments from Lebanon Valley to the Debtor and MECCA were largely distributed to the residents in compensation for their services. In addition, the Debtor and MECCA supervised the work of the residents at Lebanon Valley. At Polyclinic, the Memorial residents worked under the direction and supervision of Polyclinic physicians. It is undisputed that neither the Debtor nor any MECCA physician performed any work at Polyclinic.

▆ The Court also rejects the Debtor's argument that Memorial waived the exclusivity period by giving its consent to the Lebanon Valley agreement, which allegedly led the Debtor to the belief that he could enter into a "similar" contract with Polyclinic. First, the issue of whether the Debtor violated the exclusivity period in his contract with Memorial by entering into an agreement with Polyclinic is a red herring. The instant adversary proceeding involves dischargeability of the debt pursuant to §§ 523(a)(2) and (a)(4), not merely a simple breach of contract claim, which would not be grounds for finding the debt nondischargeable. Second, assuming arguendo that Memorial did waive the exclusivity period by virtue of its consent to the Lebanon Valley agreement, that waiver with respect to that agreement did not entitle the Debtor to conceal the payment terms of the agreement with Polyclinic and divert the monies received under the contract to himself and MECCA, which Polyclinic intended to be paid to or for the benefit of Memorial. Third, the Debtor's mischaracterizes the Lebanon Valley and Polyclinic agreements as similar. As previously stated, the Lebanon Valley and Polyclinic agreements were distinct. Under the Lebanon Valley agreement the residents performed services at Lebanon Valley at times when they were not working for Memorial, and were paid by MECCA. Under the Polyclinic agreement,

however, the residents were on duty at Memorial and were being paid by Memorial, not the Debtor or MECCA.

Waiver is the intentional relinquishment of a known right, either expressly or by conduct that is inconsistent with enforcement of the right. *See Hystro Products, Inc. v. MNP Corp.,* 18 F.3d 1384, 1393 (7th Cir.1994). A prerequisite ingredient of the waiver of a right or privilege consists of an intention to relinquish it. *TMF Tool Co. v. Siebengartner,* 899 F.2d 584, 590 (7th Cir. 1990). "Before a party is deemed to have waived or relinquished a right or remedy available to it under law, a clear and distinct manifestation of such an intent must be found." *American Nat'l Bank & Trust Co. v. K–Mart Corp.,* 717 F.2d 394, 398 (7th Cir.1983) (citation omitted). The Court finds that Memorial did not make a knowing waiver because it did not know of the payment terms in the Polyclinic agreement. The Court flatly rejects the Debtor's argument that Memorial impliedly waived the benefits of the exclusivity term by consenting to the Lebanon Valley agreement. Moreover, the Pennsylvania cases on implied waiver cited by the Debtor are inapposite and not controlling here for purposes of this dischargeability determination.

When Heinle learned of the arrangement with Polyclinic on June 26, 1991, he immediately met with the Debtor and asked if he or MECCA was being compensated by Polyclinic for the residents' services. The Debtor told Heinle that he was not receiving compensation from Polyclinic. The next day, however, the Debtor recanted and told Heinle that he was in fact being compensated by Polyclinic for the use of the residents. The Court finds all of Heinle's testimony credible, but not all of the Debtor's testimony credible. The credibility of the Debtor's version of the events was impeached at trial by several prior inconsistent statements made on deposition. The Debtor's contrary testimony at trial confirmed that he was not truthful with Heinle when confronted about the Polyclinic agreement. The Court finds that the Debtor obtained the funds from Polyclinic by making representations to Memorial that he knew were false through active concealment of the true facts of the payments from Polyclinic, which the Debtor received and used for his own purposes. Therefore, Memorial has established the first element.

Next, Memorial must demonstrate by a preponderance of the evidence that the Debtor possessed the requisite intent to defraud Memorial. The Court finds that Memorial has demonstrated this element by a preponderance of the evidence. First, the Debtor's misstatement of the true payment terms of the agreement with Polyclinic to Heinle and DiPietro is indicative of his intent to deceive Memorial. Further, the Debtor signed the Polyclinic agreement on behalf of "Memorial Hospital Department of Emergency Medicine as Director, Emergency Medical Services and Program Director, Emergency Medicine Residency Program." Heinle, testified, however, that the Debtor was not authorized on behalf of Memorial to sign contracts with other parties. Heinle was the only individual on behalf of Memorial who was authorized to execute its contracts. Moreover, Heinle testified, and the Debtor corroborated, that the emergency medicine residency program of Memorial was not an entity separate and apart from Memorial, but was merely one of its several departments. Thus, neither the emergency medicine residency program of Memorial nor the Debtor as its head had any express authority from Memorial to enter into contracts purportedly binding Memorial.

Additionally, Heinle stated that he was never involved in the negotiations of the Polyclinic agreement and never authorized the Debtor to sign the Polyclinic agreement on behalf of Memorial. The Debtor concealed a very material term of the agreement with Polyclinic from Memorial by failing to inform Memorial that Polyclinic was paying for the residents' services. Heinle testified that he was aware that Memorial's residents were spending time at Polyclinic, but he was not aware that MECCA was being compensated for the residents' time spent there. Heinle further testified that he never gave the Debtor permission to use Memorial's residents at Polyclinic for the purpose of the Debtor and MECCA being compensated rather than Me-

morial. In addition, the Debtor had Polyclinic make the checks payable to nonexistent entities such as "York Memorial Emergency Residents Fund" and would deposit those funds into his and MECCA's bank accounts. Also, Meneilly testified that he understood that in return for Memorial's residents' services, Polyclinic was to pay to Memorial certain compensation to reimburse Memorial for a portion of the costs of Memorial's residency program. Based on the totality of the circumstances, the Court is able to infer that the Debtor possessed the requisite intent to defraud Memorial.

Pursuant to the final element, Memorial must show that it justifiably relied on the Debtor's representations to its detriment. The Court holds that Memorial has demonstrated by a preponderance of the evidence that it justifiably relied on the Debtor's representation as head of its emergency medicine department that the Memorial residents were at Polyclinic solely to receive necessary training, and not to line the coffers of the Debtor and MECCA while on Memorial's time clock and payroll. Memorial in fact justifiably relied on this statement to its detriment in that it was deprived of the $161,248.00 paid under the terms of the agreement with Polyclinic, which the Debtor and MECCA received but concealed and converted to the Debtor's own uses.

Accordingly, the Court holds that Memorial has established all elements under § 523(a)(2)(A). The Debtor purposely created a contrived and misleading understanding concerning the Polyclinic payments and intentionally deceived Memorial regarding the compensation actually paid by Polyclinic intended by it to be paid to Memorial. When considered collectively, the Debtor's actions created a false and misleading set of circumstances, which constitute false pretenses as to Memorial. As a result, the debt plus interest and costs is nondischargeable under § 523(a)(2)(A).

### B. *Section 523(a)(4)*

■ Section 523(a)(4) provides in pertinent part:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

11 U.S.C. § 523(a)(4). In order for Memorial to prevail under § 523(a)(4), it must prove either (1) that the Debtor committed fraud or defalcation while acting as a fiduciary, (2) that the Debtor is guilty of embezzlement or (3) larceny.

■ Memorial has alleged that the Debtor's actions constituted embezzlement. Embezzlement under § 523(a)(4) has been defined as the "fraudulent appropriation of property by a person to whom such property was entrusted or into whose hands it has lawfully come." *In re Weber*, 892 F.2d 534, 538 (7th Cir.1989) (quoting *Moore v. United States*, 160 U.S. 268, 269, 16 S.Ct. 294, 295, 40 L.Ed. 422 (1895)). To prove embezzlement, Memorial must show: (1) the Debtor appropriated the subject funds for his own benefit, and (2) the Debtor did so with fraudulent intent or deceit. *Weber*, 892 F.2d at 538; *see also Schaffer v. Dempster (In re Dempster)*, 182 B.R. 790, 802 (Bankr.N.D.Ill. 1995); *Green v. Pawlinski (In re Pawlinski)*, 170 B.R. 380, 390 (Bankr.N.D.Ill.1994). A fiduciary or trust relationship need not be established in order to find a debt nondischargeable by an act of embezzlement. *Pawlinski*, 170 B.R. at 390.

Memorial alleges that the Debtor embezzled the monies received under the Polyclinic contract because Memorial was the intended recipient of the funds. Both Maxton and Meneilly so testified for Polyclinic. First, Memorial must show that the Debtor appropriated the monies received from Polyclinic for his own use. The Debtor testified that he received, controlled, and used all the monies. Some were used for his personal gain, including paying his gambling debts and for entertainment. The Debtor utilized some unspecified amount of the money for the expenses of the residents such as books, educational seminars, and an apartment. The Court finds that the Debtor did in fact misappropriate all the monies received under the Polyclinic agreement contrary to Polyclinic's under-

standing and intent that all the funds paid were to go to Memorial.

Next, Memorial must demonstrate that the Debtor appropriated the funds by fraudulent intent or deceit. For the same reasons set forth with respect to the intent element of § 523(a)(2)(A), the Court finds that the Debtor with fraudulent intent appropriated the monies. Consequently, Memorial has established that the Debtor embezzled funds intended for but diverted from Memorial. Therefore, the debt plus interest and costs is nondischargeable under § 523(a)(4).

### V. CONCLUSION

For the foregoing reasons, the Court holds that the debt in the sum of $161,248.00 plus interest and costs is nondischargeable under §§ 523(a)(2) and 523(a)(4).

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.