Erik P. Kimball, Judge
In this adversary proceeding, the Federal Trade Commission asks this Court to determine that the debt represented by a $ 13,400,627.60 compensatory damages award entered by a federal district court is not subject to discharge in Joseph K. Rensin's bankruptcy case pursuant to 11 U.S.C. §§ 523(a)(2)(A) and/or (a)(6).
The Court conducted trial in this matter on August 9, 2018. On October 4, 2018, the plaintiff and the defendant filed post-trial briefs in the form of proposed findings of fact and conclusions of law. ECF Nos. 106 and 107. The Court has considered the evidence admitted at trial to the extent relied on by the parties in their post-trial briefs. See ECF No. 91 (limiting the Court's review of the evidence to those matters addressed by the parties in their briefs). The Court also considered the original pleadings, the arguments presented at trial and in the post-trial briefs, and two orders entered in the district court case that gave rise to the debt at issue in this adversary proceeding, which orders the Court took judicial notice of pursuant to a post-trial order. ECF No. 108. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.
FINDINGS OF FACT
The time period relevant to this action is April 9, 2008 through July 24, 2009. This is the period during which the plaintiff alleges Mr. Rensin took the actions that cause his debt to the plaintiff to be excepted from discharge.
Mr. Rensin founded BlueHippo Funding LLC and its subsidiary BlueHippo Capital LLC (together, "BlueHippo") in the early 2000s. At all relevant times, Mr. Rensin *180 was the CEO and sole owner of BlueHippo.
BlueHippo marketed computers and related products to consumers who might otherwise have been unable to purchase such items. BlueHippo advertised through radio, television, and print. A potential customer would call BlueHippo. BlueHippo employed in-house telemarketers who relied on prepared sales scripts when communicating with customers. BlueHippo specifically targeted customers with poor credit histories, telling potential customers that all they needed to buy a computer was a checking account. Most of BlueHippo's customers suffered from poor credit.
BlueHippo sold products in two different ways. Some of BlueHippo's customers attempted to purchase a computer on credit. They were required to make 13 consecutive payments and meet other conditions, after which they would receive the computer and would continue to make payments until the purchase price was paid in full. Some of BlueHippo's customers attempted to purchase a computer on a layaway plan. These customers were required to make installment payments totaling the full purchase price before receiving the computer. Many of BlueHippo's credit customers failed to make all of the required payments and so did not qualify to obtain a computer on credit. If a customer attempting to purchase a computer on credit did not make the necessary 13 consecutive payments, that customer could continue to make payments under the layaway plan and could receive a computer after full payment. Even so, many customers on the layaway plan failed to make all the payments and, in the end, did not receive a computer.
Over time, BlueHippo had three refund policies. For a time prior to March 2006, BlueHippo did not offer refunds at all. From about March 2006 through the beginning of 2007, a customer could cancel an order and obtain a refund after paying a fee of $ 175. In early 2007, BlueHippo began offering store credit to customers who failed to make all required payments. Customers were told that if they canceled an order they could use their store credit "on over a thousand desktops, laptops, monitors, TV's and more at BlueHippo.com." The store credit refund policy was the primary focus of the litigation in this adversary proceeding.
In order to use a store credit, customers were required to send BlueHippo additional money to cover shipping, handling, and taxes for online purchases and were permitted to order only one item at a time from the online store. In other words, a customer could not use a store credit without sending additional funds to BlueHippo first, and even then the customer would need to order one store credit item at a time, potentially increasing shipping and handling costs. For purposes of this Memorandum Opinion, these conditions on use of the store credit are called the "extra terms." There is no credible evidence to support Mr. Rensin's unsupported suggestion that some customers were not in fact charged taxes, shipping, and handling when trying to use store credit.[1]
BlueHippo did not disclose the extra terms in its advertisements, in the scripts *181 used by BlueHippo's telemarketers, or in any other way, prior to receiving payments from customers. Customers did not learn of the extra terms until they attempted to use a store credit.
BlueHippo received orders from 55,892 customers for which the customers obtained no merchandise, either from their original purchase attempt or via application of a store credit. BlueHippo's revenues for these 55,892 customers aggregate $ 14,062.627.51. While Mr. Rensin attempts to argue that the actual damages were much smaller and are attributable to just a tiny portion of the customers included in the 55,892 pointed to by the district court, both the district court's orders liquidating the plaintiff's claim (see below) and the parties' stipulation of facts in this case negate that argument. See ECF No. 66 ¶ 27.
In February 2008, the plaintiff filed an action in a federal district court alleging, among other things, that BlueHippo had failed to disclose to its customers, prior to initial payment, that their payments were not refundable. Although BlueHippo's store credit refund policy had been instituted about a year prior to the plaintiff's action in the district court, that suit did not focus on the store credit refund policy. The plaintiff's allegations in the 2008 district court action were aimed at BlueHippo's failure to inform potential customers, prior to receiving payment, that payments would not be refundable under any circumstances. The 2008 district court action resulted in a consent order, entered April 10, 2008 (the "Consent Order"). Among other things, the Consent Order prohibited BlueHippo and its officers and agents from "[m]aking any representation regarding any refund, cancellation, exchange or repurchase policy without disclosing clearly and conspicuously, prior to receiving any payment from customers all material terms and conditions of any refund, cancellation, exchange or repurchase policy." BlueHippo was required to pay $ 3.5 to $ 5 million in the 18 months following entry of the Consent Order, depending on total claims. To provide the plaintiff with a method to monitor compliance with the Consent Order, BlueHippo was required to respond to written requests for information from the plaintiff within five days. Mr. Rensin was not explicitly covered by the Consent Order.
In 2009, the plaintiff investigated BlueHippo's compliance with the Consent Order by requesting information as permitted by the Consent Order. When BlueHippo did not timely provide the requested information, the plaintiff sought and obtained from the district court an order holding BlueHippo in contempt of the Consent Order and requiring BlueHippo to tender the requested information.
During this time, BlueHippo was involved in litigation with a number of parties, including the plaintiff, state attorneys general, individuals, and classes of plaintiffs. The litigation and settlement costs were a substantial drain on BlueHippo. Indeed, for a time in 2009 BlueHippo was unable to ship computers to customers because of its litigation related expenses. This is important as it places in context the deceit implemented by Mr. Rensin and his company to obtain funds from unknowing customers with the intent of never providing those customers anything in return.
In a response to a written request to BlueHippo consistent with the Consent Order, the plaintiff learned of the extra terms of the store credit refund policy and the fact that BlueHippo was not advising customers of the extra terms prior to accepting funds. In November 2009, the plaintiff pursued an action in the district court *182 against BlueHippo and Mr. Rensin, seeking damages for their alleged contempt of the Consent Order. On July 27, 2010, the district court entered an order holding both BlueHippo and Mr. Rensin in contempt of the Consent Order because they had failed to disclose the extra terms of the store credit refund policy to customers prior to receiving payment. The district court's initial award was appealed to the Second Circuit Court of Appeals. On remand, the district court entered judgment against BlueHippo and Mr. Rensin, jointly and severally, in the amount of $ 13,400,627.60. It is this debt that the plaintiff seeks to have excepted from discharge in this adversary proceeding. The judgment amount represents the $ 14,062,627.51 BlueHippo received from customers making 55,892 orders where the customers neither received a computer nor received anything via store credit, less $ 126,999.91 that BlueHippo paid in refunds, and less $ 535,000 in settlements paid to the states of Pennsylvania, Texas, and Wisconsin.
When the district court entered judgment for contempt, the district court did not find that Mr. Rensin was personally liable to the plaintiff based on Mr. Rensin's own actions. Instead, the district court held Mr. Rensin liable under Fed. R. Civ. P. 65(d)(2) because of his status with BlueHippo and also because he had consented to be held personally liable to the same extent that BlueHippo was held liable. In Count III of the complaint and at summary judgment, the plaintiff argued that it had proven the elements of 11 U.S.C. §§ 523(a)(2)(A) and (a)(6) by application of collateral estoppel.[2] While the district court's orders contain certain findings that are also dispositive in this adversary proceeding, the issues relating to Mr. Rensin's personal knowledge and involvement remained to be tried here. For this reason, among others, the Court entered summary judgment in favor of the defendant on count III of the complaint and denied the plaintiff's request for summary judgment on the basis of collateral estoppel. ECF Nos. 37 and 62.
Based on the credible evidence admitted in this adversary proceeding, Mr. Rensin had full knowledge of, and personally participated in, the implementation and use of the store credit refund policy, and specifically the extra terms, and Mr. Rensin had full knowledge of, and personally authorized, the withholding of the extra terms *183 from customers prior to their payment to BlueHippo, all with the knowledge and expectation that BlueHippo would, and indeed did, receive substantial income as a result of the store credit refund policy and the extra terms. BlueHippo received very substantial revenues from customer payments under circumstances that Mr. Rensin well knew BlueHippo would never deliver a product because of the extra terms that were hidden from customers prior to their making payments. As the captain of the ship, with not only direct oversight but regular operational involvement in every aspect of the business relevant to this fraud, and with full knowledge of the financial benefits reaped from the fraud, at a time when BlueHippo was otherwise cash strapped, there is no doubt that Mr. Rensin orchestrated the entire affair. In light of his changing testimony over time, and the greater weight of the evidence to the contrary, the Court does not find credible Mr. Rensin's testimony that he did not know during the relevant period of the implementation of the store credit refund policy and the failure to disclose the extra terms to customers, but only learned of these matters long after.
Mr. Rensin was the founder, CEO, and chairman of the board of BlueHippo from its inception until he left the company in July 2009. Mr. Rensin was also the sole owner of BlueHippo and the staffing entity that provided all of BlueHippo's employees. Mr. Rensin personally hired BlueHippo's department heads and they reported directly to him. Every employee of BlueHippo ultimately reported to Mr. Rensin. Mr. Rensin met regularly with the company's chief operating officer, who was responsible for advertising, marketing, and the telemarketing scripts. Mr. Rensin had weekly meetings with the chief operating officer, the telemarketers, and the marketing personnel. Mr. Rensin also had regular meetings with employees in charge of advertising, to oversee the effectiveness of BlueHippo's ads. Mr. Rensin reviewed BlueHippo's ads and telemarketing scripts and gave input on them. In addition to weekly meetings, Mr. Rensin had regular contact with BlueHippo's telemarketers, who worked on the other side of a wall from his office. Mr. Rensin regularly walked through the telemarketing area and overheard telemarketers reading from scripts as they interacted with customers. Given his overarching management control of BlueHippo, which was in effect Mr. Rensin's company, the Court did not find credible Mr. Rensin's testimony that when he walked through the telemarketing area he failed to interact in any way with his own employees or otherwise take note of what was happening as he passed through.
Mr. Rensin contends that he did not know of the extra terms of BlueHippo's store credit policy until after the relevant period. The Court did not find this testimony credible. Based on the greater weight of the evidence in this adversary proceeding, including Mr. Rensin's own prior testimony, his complete control over BlueHippo, his detailed involvement in its day to day affairs including its marketing to customers, and his knowledge of the finances of the company, there is no doubt that Mr. Rensin not only knew of the extra terms but specifically authorized their implementation in order to ensure the substantial net revenue BlueHippo actually obtained as a result of the extra terms.
Mr. Rensin was involved in the decision to implement each of BlueHippo's refund policies. Mr. Rensin previously testified that he was one of the people involved in creating the store credit refund policy. Shortly after the relevant time period, in 2009, Mr. Rensin testified concerning the extra terms including that they were created in response to a class action against BlueHippo. Mr. Rensin's testimony at that *184 time, taking into account the manner in which he answered questions, is not consistent with Mr. Rensin having learned of the extra terms only after his departure from the company. In other words, it is apparent that Mr. Rensin was testifying from knowledge he had during the relevant period rather than from knowledge he gained after the relevant period but prior to his testimony. In addition, in a separate sworn statement, Mr. Rensin stated, based on his personal knowledge, that the extra terms had been in place since BlueHippo created the online store. If Mr. Rensin learned of the extra terms only after the fact, he could not personally know that the extra terms were always part of the store credit return policy.
Mr. Rensin's trial testimony that he did not learn of the extra terms until after the relevant period is also inconsistent with a position he took in this very litigation. Mr. Rensin earlier argued that he had obtained advice of counsel relating to the extra terms during the relevant period. In order to present that defense, Mr. Rensin would need to show that he had disclosed all material facts to his attorney and that he had relied in good faith on the attorney's advice. United States v. Petrie , 302 F.3d 1280, 1287 (11th Cir. 2002). This would require Mr. Rensin to show that he advised the relevant lawyer or lawyers of the extra terms as well as when they were disclosed to customers. But if Mr. Rensin did not know about the extra terms during the relevant period, he could not have provided counsel with that information. After discovery by the plaintiff revealed that none of the counsel advising BlueHippo during the relevant time remembered providing advice on this issue, Mr. Rensin changed his position, claiming that he did not know of the extra terms during the relevant period. Indeed, Mr. Rensin conceded at trial in this matter that he never sought advice of counsel with regard to the extra terms.
Even more amazingly, at a deposition in this adversary proceeding, Mr. Rensin testified that the extra terms in fact never existed and that he had always said they never existed. That testimony was in direct contradiction to his own prior testimony from the district court action, which was admitted in this case. It is obvious that Mr. Rensin's testimony at trial that he did not know of the extra terms during the relevant period is a brazen attempt to avoid judgment against him in this case.
Similarly, the Court does not find credible Mr. Rensin's testimony that the company's in-house counsel was responsible for the extra terms and hid them from Mr. Rensin. The testimony of in-house counsel, presented to this Court in written form only, directly contradicts Mr. Rensin's position. Without a live witness to judge credibility, and with only Mr. Rensin's otherwise doubtful testimony on this issue, the Court must take the written testimony of in-house counsel on its face.
CONCLUSIONS OF LAW
Count I of the complaint seeks a ruling that the debt represented by the district court's contempt judgment is non-dischargeable under 11 U.S.C. § 523(a)(2)(A). Under that provision, a debt is not discharged if such debt is one "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ... false pretenses, a false representation, or actual fraud...." Courts generally require creditors to prove the traditional elements of common law fraud to succeed on a § 523(a)(2)(A) claim alleging false representation or actual fraud. Those elements are: "(1) the debtor made a false representation to deceive the creditor, (2) the creditor relied on the misrepresentation, (3) the *185 reliance was justified, and (4) the creditor sustained a loss as a result of the misrepresentation." SEC v. Bilzerian (In re Bilzerian) , 153 F.3d 1278, 1281 (11th Cir. 1998).
False pretenses differs from false representation or actual fraud only in that: (a) the plaintiff may prove either the defendant's intent to deceive the plaintiff or the defendant's reckless indifference for the truth; and (b) rather than a false representation, the plaintiff may prove the defendant committed "any intentional fraud or deceit practiced by whatever method in whatever manner." Taylor v. Wood (In re Wood), 245 F. App'x 916, 918 (11th Cir. 2007) (quotation omitted).
The concept of false pretenses is especially broad ... False pretenses may be implied from conduct or may consist of concealment or non-disclosure where there is a duty to speak, and may consist of any acts, work, symbol, or token calculated and intended to deceive ... It is a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or a false and misleading understanding of a transaction, by which a creditor is wrongfully induced by a debtor to transfer property or extend credit to the debtor ... Silence or concealment as to a material fact can constitute false pretenses.
Id. "What constitutes 'false pretenses' in the context of § 523(a)(2)(A) has been defined as 'implied misrepresentations or conduct intended to create and foster a false impression.' " Ershowsky v. Freedman (In re Freedman) , 431 B.R. 245, 256 (Bankr. S.D. Fla. 2010) (quoting Memorial Hosp. v. Sarama (In re Sarama) , 192 B.R. 922, 927 (Bankr. N.D. Ill. 1996).
When BlueHippo informed customers that they could apply their payments for store credit but failed to inform customers that they would be unable to use a store credit unless they paid shipping, handling, and taxes up front and that they could only order one item at a time, BlueHippo made knowingly false representations to customers and also concealed material facts. It is obvious that these misrepresentations and concealments were intended to deceive customers. Customers were led to believe that their payments could simply be applied to buy products from BlueHippo's online store, but this was not true. BlueHippo intended for customers to make payments in connection with which BlueHippo knew it may never be required to deliver products. Many thousands of BlueHippo's customers relied on these misrepresentations and concealments as they made millions of dollars of payments and received no value in return. The Second Circuit Court of Appeals specifically recognized, in this very matter, that the extra terms were material to the transaction because if the extra terms had been revealed to BlueHippo's customers prior to purchase that disclosure would have influenced the purchase decision. FTC v. BlueHippo Funding, LLC , 762 F.3d 238, 246 (2d Cir. 2014). The plaintiff argues, and Mr. Rensin does not contest, that the Court may presume reliance on BlueHippo's misrepresentations and concealment, citing various decisions in the consumer protection context. The Court agrees.[3] But even without this presumption, from the customers making substantial payments to BlueHippo and their failure to obtain value in exchange for those payments, it is obvious that they actually relied on what BlueHippo told them, which was fatally misleading and amounted to *186 fraudulent misrepresentation and concealment. The customers were justified in that reliance as they had no way of knowing that their ability to use promised store credits would be limited, a fact they could learn only when they attempted to purchase products from the online store using credits. And many thousands of customers sustained a loss as a result of the misrepresentations and concealments as they received nothing in exchange for their payments. The district court order holding BlueHippo and Mr. Rensin in contempt sets out the appropriate calculation of the damages, which the plaintiff is entitled to collect under federal law. Mr. Rensin attempts to re-argue the amount of the damages, but this matter has already been finally determined on remand to the district court consistent with the ruling of the Second Circuit Court of Appeals.
Based on the credible evidence admitted in this case, not only did Mr. Rensin go along with this fraud, but he was at the helm of and guided BlueHippo in its every action in connection with this fraud. Mr. Rensin knew of the extra terms from their inception. Mr. Rensin previously testified at length about why the extra terms were put in place, in a context that indicates he knew of the extra terms at all times during the relevant period. As discussed above, Mr. Rensin's testimony in this adversary proceeding that he did not learn of the extra terms until after the relevant period was not credible as it is inconsistent with his prior testimony and statements under oath, and is conveniently changed in light of the course of litigation in this very adversary proceeding. Mr. Rensin controlled every aspect of BlueHippo's business, from its marketing to customers, to what was communicated to customers when they contacted BlueHippo by telephone, to what refund policies were in place and what they provided, to oversight of its financial performance, among other things. The Court did not find credible any of Mr. Rensin's testimony that he was unaware of relevant aspects of BlueHippo's business. BlueHippo reaped significant net revenues as a result of the refund policy and the extra terms. There is no doubt that Mr. Rensin knew this as it was happening. Indeed, there is no doubt that he intended exactly the outcome BlueHippo obtained from implementing the extra terms. Mr. Rensin acted with the intent to deceive, many thousands of customers relied on that deception, they were justified in relying on the deception as they could not have known of it, and they were harmed because they paid BlueHippo millions of dollars and received no value in return. Mr. Rensin is responsible for the entire harm brought to bear on BlueHippo's customers, not just because the district court held him liable under the contempt order, but because he himself was responsible for the fraud.
For the foregoing reasons, the Court will enter judgment in favor of the plaintiff on Count I of the complaint, ruling that the entire sum represented by the contempt order shall be excepted from discharge in this bankruptcy case under § 523(a)(2)(A).
Count II of the complaint seeks a determination that the debt is not dischargeable under 11 U.S.C. § 523(a)(6). A discharge under section 727 "does not discharge an individual debtor from any debt ... for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). This Court has issued several decisions analyzing in detail the "willful and malicious" standard in § 523(a)(6). See Stewart Tilghman Fox & Bianchi, P.A. v. Kane (In re Kane) , 470 B.R. 902 (Bankr. S.D. Fla. 2012), aff'd , 485 B.R. 460 (S.D. Fla. 2013), aff'd , 755 F.3d 1285 (11th Cir. 2014) ;
*187 Drewes v. Levin (In re Levin ), 434 B.R. 910 (Bankr. S.D. Fla. 2010).
An injury alleged as the basis for a non-dischargeable claim under § 523(a)(6) must be both willful and malicious. In Kawaauhau v. Geiger , the United States Supreme Court addressed the meaning of the term "willful" in subsection (a)(6). 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). The Kawaauhau court considered whether a claim for medical malpractice would be excepted from discharge. The Supreme Court determined that the reckless or negligent conduct alleged in the case before it was not sufficient to meet the requirements of § 523(a)(6). The Supreme Court then addressed what conduct may in fact result in a non-dischargeable debt under that provision, stating:
The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional injury , not merely a deliberate or intentional act that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, i.e. , "reckless" or "negligent," to modify "injury." Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the consequences of an act," not simply "the act itself."
Id. at 61, 118 S.Ct. 974. (citing Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964) (emphasis added) ).
While the Supreme Court unambiguously excluded injury resulting from reckless or negligent conduct from the ambit of § 523(a)(6), the Kawaauhau decision does not address the proof required to show intent under the Court's definition of the term "willful." The decision provides no explicit guidance as to whether a plaintiff must show that the defendant subjectively intended the resulting injury, or whether a plaintiff may prove the requisite intent by showing that the defendant undertook an intentional act that was substantially certain to result in the plaintiff's injury. However, in its brief exposition on the concept of intent, the Supreme Court distinguished "intentional torts" from torts relying on reckless or negligent acts, and cited the Restatement (Second) of Torts for its definition of intent. By drawing a parallel between the concept of intent in tort at common law and the requirement of willfulness in section 523(a)(6), the Supreme Court shed light on what must be proven to discharge a debt under this provision.
To prove an intentional tort under common law it is, of course, sufficient to show that the defendant subjectively intended the harm that resulted.
Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result. As the probability that the consequences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses the character of intent, and becomes mere recklessness ... As the probability decreases further, and amounts only to a risk that the result will follow, it becomes ordinary negligence... All three have their important place in the law of torts, but the liability attached to them will differ.
Restatement (Second) of Torts § 8A, cmt. b (1965). Where a person undertakes an intentional act that injures another or *188 property of another, but lacks a specific intent to cause the resulting injury, that person's potential liability in tort falls on a continuum based on the probability that the person's act will result in such injury. When there is a substantial certainty that injury will result from a given intentional act, one who so acts may be held liable for an intentional tort.
By referencing this definition of "intent," the Supreme Court acknowledged that it is not necessary for a plaintiff seeking relief under § 523(a)(6) to prove that the defendant intended to cause the injury itself. As at common law, the plaintiff may show that the defendant acted intentionally and the act in question was certain or substantially certain to result in the injury.
Consistent with this analysis, the Eleventh Circuit Court of Appeals held: "Because Congress reenacted section 523(a)(6) in the context of the common law, we conclude that a debtor is responsible for a 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury." Hope v. Walker (In re Walker), 48 F.3d 1161, 1165 (11th Cir. 1995) (citing Restatement (Second) of Torts § 8A ). Although the Eleventh Circuit issued its decision in Walker prior to the Supreme Court's ruling in Kawaauhau, the Eleventh Circuit thereafter confirmed its analysis in Walker. Thomas v. Loveless (In re Thomas), 288 F. App'x 547, 549 (11th Cir. 2008) (citing In re Walker, 48 F.3d at 1165 ).
Numerous decisions support the conclusion that where injury is a substantial certainty a debtor's intentional act may result in a non-dischargeable obligation under § 523(a)(6). E.g., Markowitz v. Campbell (In re Markowitz), 190 F.3d 455 (6th Cir. 1999) ; Miller v. J.D. Abrams Inc. (In re Miller), 156 F.3d 598, 603-04 (5th Cir. 1998) ; Baldwin v. Kilpatrick (In re Baldwin), 245 B.R. 131 (9th Cir. BAP 2000) ; Via Christi Reg'l Med. Ctr. v. Budig (In re Budig), 240 B.R. 397, 401 (D. Kan. 1999) ; Fid. Fin. Servs. v. Cox (In re Cox), 243 B.R. 713 (Bankr. N.D. Ill. 2000) ; Avco Fin. Servs. v. Kidd (In re Kidd), 219 B.R. 278, 285 (Bankr. D. Mont. 1998).
There is some disagreement among the courts as to whether the substantial certainty standard is a subjective standard, requiring the plaintiff to prove that the defendant knew the act was substantially certain to cause injury, or an objective standard, requiring the plaintiff to show that the defendant's act was substantially certain to cause injury without regard to the defendant's actual belief or knowledge in this regard. Via Christi Reg'l Med. Ctr. v. Englehart (In re Englehart), 229 F.3d 1163 (10th Cir. 2000) (examining cases); see also Jendusa-Nicolai v. Larsen, 677 F.3d 320 (7th Cir. 2012). For example, the Fifth Circuit has held that substantial certainty requires an objective analysis by the court; the defendant's personal belief or knowledge on substantial certainty need not be proven. See Shcolnik v. Rapid Settlements Ltd. (In re Shcolnik), 670 F.3d 624, 629 (5th Cir. 2012) ; Guerra & Moore Ltd. v. Cantu (In re Cantu), 389 F. App'x 342 (5th Cir. 2010) ; Red v. Baum (In re Red), 96 F. App'x 229 (5th Cir. 2004) ; In re Miller, 156 F.3d at 603 ("either objective substantial certainty or subjective motive meets the Supreme Court's definition of 'willful ... injury' in § 523(a)(6)"). On the other hand, the Tenth Circuit has held that the term "willful" in subsection (a)(6) requires the court to determine whether the defendant knew or believed the act was substantially certain to result in injury, a subjective standard. In re Englehart, 229 F.3d 1163.
Where proof of the defendant's knowledge with regard to substantial certainty is required, the defendant is unlikely *189 to admit that he or she acted with actual knowledge an injury would result. "In addition to what a debtor may admit to knowing, the bankruptcy court may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury-producing action." Carrillo v. Su (In re Su), 290 F.3d 1140, 1146 n.6 (9th Cir. 2002). "The Debtor is charged with the knowledge of the natural consequences of his actions." Ormsby v. First Am. Title Co. of Nev. (In re Ormsby), 591 F.3d 1199, 1206 (9th Cir. 2010) (citing Cablevision Sys. Corp. v. Cohen (In re Cohen), 121 B.R. 267, 271 (Bankr. E.D.N.Y. 1990) ).
Most of the decisions addressing the nature of the substantial certainty analysis involve financial harm similar to that presented here. See, e.g., In re Englehart, 229 F.3d 1163 ; Conseco f/k/a Greentree Fin. Servs. v. Howard (In re Howard), 261 B.R. 513, 521 (Bankr. M.D. Fla. 2001). In these cases, the plaintiff typically alleges that the defendant misapplied or withheld funds or other property, interfered with contractual relations, or the like. In financial tort cases, because of the somewhat attenuated relationship between the defendant's act and the resulting harm, a purely objective substantial certainty analysis would bring the court dangerously close to the recklessness standard decried in Kawaauhau. In such cases, using a subjective standard for substantial certainty avoids this risk.[4] For this reason, the Court applies the subjective standard in the present case.
Section 523(a)(6) also requires that the debt arise from a "malicious" injury. "Malice can be implied when a debtor commits an act that is 'wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill will.' " In re Thomas, 288 F. App'x at 549 (quoting In re Walker, 48 F.3d at 1164 ).
From the evidence admitted in this adversary proceeding, the Court finds that the plaintiff met its burden in proving that Mr. Rensin's conduct was wrongful and without just cause and thus was malicious within the meaning of § 523(a)(6). Mr. Rensin used BlueHippo to create a series of transactions aimed at defrauding consumers for the purpose of filling the coffers of BlueHippo. There was nothing defensible about his actions.
To meet its burden on the willfulness standard under the case law analyzed above, in light of the circumstances of this case, the plaintiff must provide evidence causing the Court to infer that Mr. Rensin himself knew, at the time he caused BlueHippo to implement and maintain the extra terms without appropriate disclosure to customers, that harm to BlueHippo's customers was certain or substantially certain to result. The evidence admitted in this case supports the Court's conclusion that, by implementing the store credit refund policy and failing to disclose the extra terms prior to receiving customer funds, Mr. Rensin intended for BlueHippo to obtain funds from customers under circumstances were Mr. Rensin expected that BlueHippo would not need to provide any value in exchange for those payments. Mr. *190 Rensin knew that BlueHippo's customers had poor credit and regularly were unable to make all of the payments necessary to obtain a computer. Mr. Rensin caused BlueHippo to take their money, without telling them of roadblocks BlueHippo would later use to inhibit, and often prevent, the customers from obtaining any benefit in exchange for their payments. There is no doubt that Mr. Rensin knew, and in fact intended, the financial impact of these actions, as BlueHippo took in millions of dollars under this scheme. The scheme depended on BlueHippo taking customers' money and giving them nothing. In effect, Mr. Rensin caused BlueHippo to steal from its own customers. As the Court has already ruled, the evidence supports a finding of fraud based on both misrepresentation and concealment. But the evidence goes further than that. "The Debtor is charged with the knowledge of the natural consequences of his actions." Ormsby v. First Am. Title Co. of Nev. (In re Ormsby), 591 F.3d 1199, 1206 (9th Cir. 2010) (citing Cablevision Sys. Corp. v. Cohen (In re Cohen) , 121 B.R. 267, 271 (Bankr. E.D.N.Y. 1990) ). Based on the greater weight of the evidence admitted in this case, Mr. Rensin well knew that BlueHippo's customers would be harmed by the failure to disclose the extra terms. The plaintiff has also met its burden on the willfulness standard.
For the foregoing reasons, the Court will enter judgment in favor of the plaintiff on Count II of the complaint.
Consistent with the Court's order at summary judgment, the Court will enter judgment in favor of Mr. Rensin on Count III of the complaint. See ECF No. 37.
CONCLUSION
The Court will enter a separate judgment consistent with this Memorandum Opinion (a) in favor of the Federal Trade Commission under Count I and Count II of the complaint and (b) in favor of Joseph K. Rensin under Count III of the complaint. The entire claim held by the Federal Trade Commission, represented by that certain Final Judgment Imposing Compensatory Contempt Sanctions , entered by the United States District Court for the Southern District of New York on April 19, 2016, in case number 08 Civ. 1819 (PAC), in the amount of $ 13,400,627.60 plus post-judgment interest, shall be excepted from discharge in this bankruptcy case pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6).
ORDERED.

Indeed, Mr. Rensin's suggestion that some customers were not required to pay taxes, shipping, and handling to use store credit is at odds with his argument elsewhere that the extra terms were never implemented by BlueHippo at all. If the extra terms were never implemented, then no customer would have been required to pay taxes, shipping, and handling up front to use store credit, not just some customers. In any case, Mr. Rensin's positions on this point are contrary to the findings of the district court which have collateral estoppel effect in this action.

Collateral estoppel principles apply in discharge exception proceedings under 11 U.S.C. § 523(a). Grogan v. Garner , 498 U.S. 279, 285 n.11, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). "A bankruptcy court may rely on collateral estoppel to reach conclusions about certain facts, foreclose relitigation of those facts, and then consider those facts as 'evidence of nondischargeability.' " Thomas v. Loveless (In re Thomas) , 288 F. App'x 547, 548 (11th Cir. 2008) (citation omitted). "Collateral estoppel, or issue preclusion, bars relitigation of an issue previously decided in judicial or administrative proceedings if the party against whom the prior decision is asserted had a 'full and fair opportunity' to litigate that issue in an earlier case." St. Laurent v. Ambrose (In re St. Laurent) , 991 F.2d 672, 675 (11th Cir. 1993). Because the order at issue in this case was rendered by a federal court, this Court must apply federal collateral estoppel law. CSX Transp., Inc. v. Bhd. of Maint. of Way Emps. , 327 F.3d 1309, 1316 (11th Cir. 2003). Under federal law, the application of collateral estoppel requires satisfying the following prerequisites: "(1) the issue be identical in both the prior and current action; (2) the issue was actually litigated; (3) the determination of the issue was critical and necessary to the judgment in the prior action; and (4) the burden of persuasion in the subsequent action not be significantly heavier." SEC v. Bilzerian (In re Bilzerian) , 153 F.3d 1278, 1281 (11th Cir. 1998). If all four requisites are satisfied, "estoppel operates to bar the introduction or argumentation of certain facts necessarily established in [the] prior proceeding." Tampa Bay Water v. HDR Eng'g, Inc. , 731 F.3d 1171, 1180 (11th Cir. 2013) (citation omitted).

The presumption applies equally in the context of this discharge exception proceeding. FTC v. Gugliuzza (In re Gugliuzza) , 527 B.R. 370, 377-78 (C.D. Cal. 2015)

Courts have struggled far less with physical intentional torts. See, e.g., Pettey v. Belanger, 232 B.R. 543 (D. Mass. 1999) ; Drewes v. Levin (In re Levin), 434 B.R. 910 (Bankr. S.D. Fla. 2010) ; Kleman v. Taylor (In re Taylor), 322 B.R. 306, 309 (Bankr. N.D. Ohio 2004) ; Montgomery v. Herring (In re Herring) , 193 B.R. 344, 352 (Bankr. N.D. Ala. 1995). In such cases, the circumstantial evidence of the defendant's actual knowledge or belief tends to merge with the evidence supporting a finding of substantial certainty on an objective basis. To put it plainly, the willfulness of the act under § 523(a)(6) is often fairly obvious given the circumstances.